UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ATEL MARITIME INVESTORS, LP, et al.** | **CIVIL ACTION** |
| **VERSUS** | **No. 08-1700** |
| **SEA MAR MANAGEMENT, L.L.C., et al.** | **SECTION I/4** |

## ORDER AND REASONS

Before the Court are cross motions for summary judgment filed by plaintiffs, Atel Maritime Investors, LP, et al. ("Atel"),[1] and defendant, Sea Mar Management, L.L.C. ("Sea Mar").[2] For the following reasons, the motions are **DENIED**.

### *BACKGROUND*

On July 4, 2004, Atel entered into two Master Bareboat Charter Agreements ("MBCA") with Sea Mar.[3] Under the MBCA, Atel granted Sea Mar a demise charter[4] for four Atel vessels ("the Atel vessels") for a period of three years.[5] The MBCA obligated Sea Mar to "use its commercially reasonable efforts to obtain time charters[6] for the Vessels and to keep the Vessels under time charter throughout the term of this Charter."[7]

---

[1] R. Doc. No. 161.
[2] R. Doc. No. 153.
[3] R. Doc. No. 1. Atel and Sea Mar agreed to two charter agreements covering four vessels. The terms of the two charter agreements are identical with the exception of the vessel names and the Atel entity involved. See R. Doc. No. 161-4. Because the material terms are identical, the Court will treat them as one agreement for the purposes of deciding these motions.
[4] A demise charter is "a charter under which the shipowner surrenders possession and control of the vessel to the charterer, who then succeeds to many of the shipowner's rights and obligations." Black's Law Dictionary 250 (8th ed. 2008).
[5] R. Doc. No. 161-4, pp. 1-2.
[6] A time charter is "[a] charter under which the shipowner continues to manage and control the vessel, but the charterer designates the ports of call and the cargo carried." Black's Law Dictionary 250-251 (8th ed. 2008).
[7] R. Doc. No. 161-4, p. 3.

To understand Atel's allegations in this case, it is important to examine the defendants' corporate structure. Defendant, Nabors Industry, Ltd. ("NIL"), is a holding company.[8] At the time of the contract at issue,[9] it held interests in both Sea Mar and defendant, Nabors Well Services, Co. ("NWS").[10] NWS was a wholly owned subsidiary of NIL. NIL held a 25% interest in Sea Mar.[11] Additionally, the President of NWS, Jan De Witt, was a member of the board of directors of Sea Mar.[12] Atel alleges that the relationships between these companies provided the motive for the alleged fraud.

Atel alleges that, over the course of the MBCA, Sea Mar, NIL, and NWS breached the terms of the MBCA[13] and engaged in a fraud to steal a portion of the revenues generated from time chartering the Atel vessels.[14] Under the MBCA, in exchange for Sea Mar's commercially reasonable efforts to obtain time charters, Atel promised to pay Sea Mar a management fee of $300.00 per day per vessel plus an incentive fee of 5% of the gross daily revenues in excess of $5000.00 per day per vessel.[15] Atel alleges that rather than have Sea Mar charter the vessels directly, NWS would locate the potential charterers. Once a customer was found, Sea Mar would first charter the vessel to NWS. In turn, NWS would subcharter the Atel vessels to the end user at a higher rate. Because Sea Mar paid Atel the revenue earned as a result of the initial charter between Sea Mar and NWS, Atel contends that this arrangement meant that Atel received less revenue than if Sea Mar had chartered the vessels directly to the end-users.[16] It is important to note that Atel does not dispute that it gave its consent to the rates paid by NWS to Sea Mar.

---

[8] R. Doc. No. 161-6, p. 16.
[9] NIL sold its interest in both NWS and Sea Mar to an unrelated entity, Hornbeck Offshore, in August, 2007. R. Doc. No. 161-9, p. 28.
[10] R. Doc. No. 161-6, p. 16.
[11] R. Doc. No. 161-9, p. 21.
[12] R. Doc. No. 161-6, p. 17.
[13] R. Doc. No. 1, paras. 6-9.
[14] R. Doc. No. 102.
[15] R. Doc. No. 161-4, p. 12.
[16] R. Doc. No. 102, para. 42.

Atel alleges, however, that they were not aware that NWS was subchartering the vessels at a higher rate.[17]

*STANDARD OF LAW*

**Summary Judgment Standard**

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. Celotex, 477 U.S. at 323; Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party must carry this burden as to each essential element on which it bears the burden of proof. Schaefer v. Gulf Coast Regional Blood Center, 10 F.3d 327, 330 (5th Cir. 1994). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

---
[17] R. Doc. No. 102, paras. 42-45.

3

Lobby, Inc., 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. Id. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." Id. at 255; see also Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

## DISCUSSION

### A. Contract Claims

A contract for the management and operation of a vessel is a maritime contract. See Hadjipateras v. Pacifica, S.A., 290 F.2d 697, 703 (5th Cir. 1961). "Construction of maritime contracts is governed by federal maritime law." Randall v. Chevron U.S.A., Inc., 13 F.3d 888, 894 (5th Cir. 1994). Federal maritime law includes general common-law principles of contract law. In re Tasch, Inc., 46 Fed. Appx. 731, 2002 WL 1973464 at * 2 (5th Cir. 2002). A martime contract should be read as a whole and its words given their plain meaning unless the provision is ambiguous. Weathersby v. Conoco Oil Co., 752 F.2d 953, 955 (5th Cir. 1984). A court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous. Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1214 (5th Cir. 1986).

Atel alleges that Sea Mar breached the MBCA by, among other things, violating the agreement's no assignment clause. Article 15 of the MBCA provides:

> This Charter is personal in nature and may not be assigned, sold, pledged or otherwise transferred by either party without (i) the prior written consent of the other party.[18]

Atel argues that NWS's practice of subchartering constituted an assignment of Sea Mar's duties under the contract. A reading of the contract as a whole, however, reveals that Sea Mar did not

---
[18] R. Doc. No. 161-4, p. 28.

4

assign its rights or obligations. Although Sea Mar executed a Master Time Charter Agreement with NWS, such agreement was not exclusive and Sea Mar retained the ability to charter to other entities.[19] NWS's practice of subchartering was not an assignment or transfer of the charter because NWS did not receive the benefit of the MBCA nor commit to performing the duties required by the agreement.

NWS's practice of subchartering did not violate the MBCA because the right of a charterer to sublet a vessel is implied unless the charter contains an express provision forbidding subcharters. See Benedict on Admiralty § 185 (7th Ed. 2008) (*citing* The Ely, 110 Fed. 563, 570 (S.D.N.Y. 1901), aff'd 122 Fed. 447 (2d Cir. 1903), cert denied 189 U.S. 514 (1903)). The MBCA does not contain an express provision forbidding subcharters. To the contrary, the whole purpose of the MBCA was for Atel to charter the vessels to Sea Mar for the purpose of subchartering the vessels to third parties.[20]

In its motion, Atel points to evidence that NWS did not charter the Atel vessels until it had identified a subcharterer.[21] Atel argues that this evidence demonstrates that Sea Mar had assigned its duties to find charters for the Atel vessels. As noted above, however, NWS was permitted charter and then subsequently subcharter the vessels. While NWS and Sea Mar were related entities, a question of material fact remains as to whether NWS, even while making its own profit through subchartering, was paying market competitive rates to Sea Mar. Sea Mar identified evidence that NWS provided independent value through its credit worthiness and commercial good will.[22]

---

[19] R. Doc. No. 161-21.
[20] Atel argues that the Court should consider the fact that Sea Mar proposed an amendment to the MBCA that would have expressly permitted its arrangement with NWS and such amendment was not adopted by Atel. Where, as here, the language of the contract is unambiguous, the Court should not look beyond the language of the contract to determine the intent of the parties. Fontenot, 791 F.2d at 1214.
[21] R. Doc. No. 161-10, p. 88.
[22] R. Doc. No. 161-10, p. 90.

Summary judgment on behalf of Sea Mar is not appropriate on the breach of contract claims because a genuine question of material fact exists as to whether Sea Mar used "commercially reasonable efforts"[23] to solicit time charters of the Atel vessels. Sea Mar argues that Atel approved the rates paid by NWS on its charters.[24] This fact is not dispositive. The MBCA provided that Sea Mar "shall be responsible for the solicitation, bidding and negotiation of time charters."[25] Presumably, one factor that influenced Atel to contract with Sea Mar was Sea Mar's market expertise in the time charter market. There is no provision in the contract that frees Sea Mar of its responsibility to use commercially reasonable efforts simply because Atel consents to the NWS day rates.

**B. Fraud Claims**

Federal courts sitting in admiralty apply common law fraud principles. Black Gold Marine, Inc. v. Jackson Marine Company, Inc., 759 F.2d 466, 470 (5th Cir. 1985). To prevail on a fraud claim, a party must prove that:

> (1) the deceiving party made a material misrepresentation or nondisclosure, (2) the representation was false or the nondisclosure implied that the facts were different from what the deceived party understood them to be, (3) the deceiving party knew that the representation was false or that the nondisclosure implied the existence of false facts, (4) the deceiving party intended the deceived party to rely on the misrepresentation or nondisclosure, and (5) the deceived party detrimentally relied upon the misrepresentation or nondisclosure. Id.

Atel argues that Sea Mar failed to disclose the fact that NWS was subchartering the Atel vessels at a higher rate than NWS was paying to Sea Mar. This nondisclosure, if proven, would

---

[23] Article 3(b) of the MBCA provides that Sea Mar "shall use its commercially reasonable efforts to obtain time charters for the Vessels and to keep the Vessels under time charter throughout the term of this Charter." R. Doc. No. 161-4, p. 3.
[24] R. Doc. No. 153, para. 9.
[25] R. Doc. No. 161-4, p. 3.

6

imply that the facts were different than Atel perceived them to be. Atel argues that it assumed the day rates charged to NWS were market rates. NWS's ability to immediately subcharter the boats at a higher rate would imply that Sea Mar was not charging a market rate.

A genuine issue of material fact exists as to whether Sea Mar knew that NWS was able to obtain higher day rates than Sea Mar was able to obtain from NWS. Sea Mar contends that because the two companies were distinct entities, employees of Sea Mar were unaware of the rates being charged by NWS for subcharters.[26] The deposition of Dennis Auyeung indicates that Sea Mar, through a conversation with Sea Mar's Vice President of Finance, John Powell, was aware of the NWS day rates.[27] By contrast, Powell denies that any such conversation took place.[28] Credibility disputes, such as this one, are best resolved at trial.

Atel alleges that the defendants were engaged in a scheme to secrete ten percent of the revenues earned through the chartering of the Atel vessels. It supported these allegations through deposition testimony that the CEO of NIL instructed Jan DeWitt, the President of NWS and a Sea Mar board member, to arrange for NWS to subcharter the Atel vessels at a higher rate.[29] Such a scheme, if proven at trial, would demonstrate that Sea Mar intended for Atel to rely on its nondisclosure. Further, for such a scheme to succeed, as the defendants' scheme allegedly did, Atel would have had to rely on the nondisclosure to their detriment. Accordingly, based on a consideration of the Black Gold Marine factors, summary judgment on Atel's fraud claims is inappropriate at this time.

## CONCLUSION

For the reasons state above,

---

[26] R. Doc. No. 153-3, p. 4.
[27] R. Doc. No. 161-9, p. 107.
[28] R. Doc. No. 161-5, p. 56.
[29] R. Doc. No. 161-11, pp. 100-101.

**IT IS ORDERED** that Atel's motion for summary judgment[30] is **DENIED.**

**IT IS FURTHER ORDERED** that Sea Mar's motion for summary judgment[31] is **DENIED.**

New Orleans, Louisiana, December 18, 2009.

                                              **LANCE M. AFRICK**
                                         **UNITED STATES DISTRICT JUDGE**

---

[30] R. Doc. No. 161.
[31] R. Doc. No. 153.