UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ATEL MARITIME INVESTORS, LP,
ET AL.

     Plaintiffs    CIVIL ACTION NO. 08-1700

VERSUS

SEA MAR MANAGEMENT, L.L.C.  SECTION "G"

NABORS WELL SERVICES CO. AND

NABORS INDUSTRIES, LTD   MAGISTRATE NO. 4

     Defendants

**POST-TRIAL BRIEF OF ATEL MARITIME INVESTORS, LP, ATEL MARITIME INVESTORS, III, LP, AND KALA KANE, LLC**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS ESTABLISHED AT TRIAL .................................................................................. 2

I.     THE SEA MAR ENTERPRISE. ............................................................................. 2

II.    THE NABORS INVERSION. .................................................................................. 3

III.   THE ATEL VESSELS............................................................................................. 7

IV.    THE NEGOTIATION AND EXECUTION OF THE MASTER BAREBOAT
       CHARTER AGREEMENTS ("MBCA'S") BETWEEN ATEL AND SMM. .................. 8

V.     THE ATEL VESSELS GO INTO SERVICE................................................................ 12

VI.    DEWITT'S PLAN FOR HOW NWS WOULD BE PAID FOR MARKETING. ............. 15

VII.   ISENBERG STEPS IN – THE 10% SKIMMING SCHEME BEGINS.......................... 16

VIII.  THE PROPOSED AMENDMENT TO THE MBCA'S ................................................. 18

IX.    DEFENDANTS' IMPLEMENTATION OF THE ISENBERG 10% SKIMMING
       SCHEME. ................................................................................................................ 22

X.     THE SALE OF THE SEA MAR ENTITIES TO HORNBECK WHICH
       UNCOVERED ISENBERG'S 10% SKIMMING SCHEME. ......................................... 24

LAW AND ARGUMENT. .................................................................................................... 26

I.     NIL, NWS  AND SMM OPERATED AS A SINGLE BUSINESS ENTERPRISE. ....... 26

       A.    **Factor #1: Ownership of Stock Sufficient to Give Actual Working
             Control** ..............................................................................................................29

       B.    **Factor #2: Common Directors or Officers**.........................................................32

       C.    **Factors #3 and 13: Unified Administrative Control of Similar or
             Supplementary Business Functions/Services Rendered by Employees
             of One Company to Another** ..............................................................................33

       D.    **Factor #9: Receiving No Business Other than that of Affiliate
             Corporation** ......................................................................................................35

       E.    **Factor #18: Excessive Fragmentation** ...............................................................35

F.      Factor #7: Corporation Causing the Incorporation of Another Affiliated Corporation ........................................................................... 36

G.      Other Factors Evidencing the Existence of a Single Business Enterprise between NIL, NWS, and SMM ........................................... 37

II.     SMM BREACHED THE MBCA'S ................................................................. 40

A.      SMM Failed to Solicit, Bid, and Negotiate Time Charters. ............. 40

B.      SMM Failed to Use Commercially Reasonable Efforts to Time Charter the ATEL Vessels – In Fact SMM Made No Effort. ............ 42

C.      SMM Failed To Account For And Report To ATEL All Income Earned By The ATEL Vessels. .......................................................... 44

D.      SMM Transferred Its Marketing Obligations To NWS In Violation Of The MBCA's. ..................................................................................... 44

E.      SMM Failed To Enter Into All Time Charters In The Name Of SMM ......... 46

F.      SMM Failed to Issue Invoices to all Time Charterers of the ATEL Vessels ................................................................................................ 46

G.      SMM Failed To Collect And Remit All Revenue Earned By The ATEL Vessels. ...................................................................................... 47

H.      The MTCA between SMM and NWS, as well as the Subcharters between NWS and End Users Did Not Comply with the Terms of the MBCA's ................................................................................................ 48

I.      SMM's Contractual Relationship With ATEL Was Not the Same As SMM's Contractual Relationship With The Nabors Vessels. .......... 49

J.      Marketing Is Not An "Other Service" Or, Alternatively, SMM Failed To Notify And Invoice ATEL For Any "Marketing Fee" Retained by NWS. ................................................................................................... 51

III.    NIL AND NWS INTENTIONALLY INTERFERED WITH THE EXECUTION OF THE SMM-ATEL MBCA'S THEREBY INDUCING SMM TO BREACH THE MBCA'S. ............................................................................................... 53

IV.     NIL, NWS, AND SMM COMMITTED/CONSPIRED TO COMMIT FRAUD IN IMPLEMENTING AND EXECUTING ISENBERG'S 10% SKIMMING SCHEME. ....................................................................................................... 56

A.      Fraud Committed By NIL. .................................................................. 57

B.      Fraud Committed By NWS. ................................................................ 57

**C.      Fraud Committed By SMM.** ..............................................................59

V.      NIL, NWS, AND SMM INTENTIONALLY MISREPRESENTED, CONCEALED, AND/OR FAILED TO DISCLOSE ISENBERG'S FRAUDULENT 10% SKIMMING SCHEME TO ATEL. ................................. 60

VI.     SMM WAS NEGLIGENT IN FAILING TO DISCLOSE MATERIAL FACTS TO ATEL. ....................................................................................................... 61

VII.    NWS AND NIL CONVERTED FUNDS THAT WERE RIGHTFULLY OWED TO ATEL. ....................................................................................................... 63

VIII.   NIL AND NWS WERE UNJUSTLY ENRICHED AS A RESULT OF ISENBERG'S 10% SKIMMING SCHEME. .................................................... 64

IX.     NIL, NWS, AND SMM ARE SOLIDARILY AND/OR JOINTLY AND SEVERALLY LIABLE FOR THE DAMAGES DUE TO ATEL. ................................. 65

X.      DAMAGES ...................................................................................................... 66

        **A.      Contractual Damages** .................................................................66

        **B.      Interest** .............................................................................................67

        **C.      Attorneys' Fees.** ..............................................................................69

        **D.      Punitive Damages** .........................................................................70

**CONCLUSION** ..................................................................................................... 73

MAY IT PLEASE THE COURT:

Plaintiffs, ATEL Maritime Investors, LP, ATEL Maritime Investors, III LP, and Kala Kane, LLC (collectively "ATEL"), submit their Post-Trial Brief as follows:

## INTRODUCTION

The evidence submitted at trial conclusively proves that Sea Mar Management, L.L.C., ("SMM"), Sea Mar Division of Nabors Well Services ("NWS"), and Nabors Industries, Ltd. ("NIL") (hereinafter sometimes collectively referred to as "Defendants" or "Nabors"), operating as a single business enterprise, engaged in a persistent course of fraudulent and deceptive business dealings with the specific intent to hide and skim an additional 10% of revenue earned from the charter of the ATEL vessels.  In doing so, SMM materially breached its obligations under the Master Bareboat Charter Agreements ("MBCA's") between SMM and ATEL.  SMM was intentionally induced into breaching the MBCA's by the actions of NWS and NIL.  This scheme, enacted over a nearly three year period, deprived ATEL of over $3,000,000 that rightfully should have been paid to ATEL pursuant to the MBCA's between SMM and ATEL. Defendants unlawfully converted these funds or, alternatively, were unjustly enriched when these funds were not provided to ATEL as required by the MBCA's.

As a result of Defendants' actions, ATEL is entitled to all damages available to it under the law and pursuant to the terms of the MBCA's which damages include, but are not limited to, $2,873,508.00 in skimmed additional charter hire, plus contractual interest or, in the alternative, legal interest, attorney's fees and punitive damages.

## FACTS ESTABLISHED AT TRIAL

I.    **The Sea Mar Enterprise.**

SMM and NWS have a common origin.  Sea Mar Management, Inc. was originally owned by Al Gonsoulin.[1]  At this time, Sea Mar Management, Inc. owned and operated 20-30 of its own vessels.[2]  Sea Mar Management, Inc. also had a large number of master service agreements ("MSA's") in place with oil companies and drilling companies for the time charter of Sea Mar's vessels.  (the "End Users").  Darrel Plaisance ("Plaisance") began working for Sea Mar Management, Inc. in 1989 as personnel manager eventually working his way up to the position of Vice President of Operations.[3]  Van DeWitt ("DeWitt") also worked for the Gonsoulin owned Sea Mar entity as Vice President and Chief Operating Officer ("COO")[4], and John Powell ("Powell") worked as a Vice President and Chief Financial Officer.[5]

In early 2000, Gonsoulin sold Sea Mar Management, Inc., including all of its vessels and continuing operations, including the MSA's with the End Users, to Pool Well Services, Inc. ("Pool").[6]  Plaisance, Dewitt and Powell continued to work for Sea Mar Management, Inc. under the new ownership after the sale.[7]  Sea Mar Management, Inc. was maintained as a separate company, a wholly owned subsidiary of Pool.[8]

Six to eight months after Pool purchased Sea Mar Management, Inc., Nabors Industries, Inc. ("NII") purchased Pool, including its wholly owned subsidiary Sea Mar Management, Inc.[9] NII purchased all assets owned by Pool and all continuing operations, which included Sea Mar

---

[1] Rec. Doc. 587, Testimony of Plaisance, p. 39:19-24; Rec. Doc. 588, p. 56:23-57:8.
[2] Rec. Doc. 587, Testimony of Plaisance, p. 40:5-9; Rec. Doc. 588, p. 59:10-16.
[3] Rec. Doc. 587, Testimony of Plaisance, p. 40:10-16.
[4] Rec. Doc. 588, Testimony of DeWitt, p. 56:23-57:8; Rec. Doc. 588, p. 62:8-16.
[5] Rec. Doc. 588, Testimony of DeWitt, p. 58:11-15; 58:20-59:1.
[6] Rec. Doc. 587, Testimony of Plaisance,  p. 42:10-43:1; Rec. Doc. 588, p. 57:9-11, 59:18-20.
[7] Rec. Doc. 587, Testimony of Plaisance, p. 43:1-2.
[8] Rec. Doc. 588, Testimony of DeWitt, p. 61:15-17; Rec. Doc. 589, p. 23:9-13.
[9] Rec. Doc. 587, Testimony of Plaisance, p. 43:3-5; Rec. Doc. 588, p. 57:12-13.

Management, Inc., its vessels with existing charters, and all MSA's.[10]  At the time of the purchase, NII was a US company.[11]  NII, as the ultimate parent, continued to operate Pool under the same trade name and kept Sea Mar Management, Inc. as a separate, but wholly owned subsidiary corporation.[12]  It was not until 2006 that Nabors changed the company's name from Pool Well Services to Nabors Well Services ("NWS").[13]

DeWitt continued to work for Sea Mar Management, Inc. as Vice President and COO after the purchase, and his job duties remained the same, including the management of the commercial side of the business such as contracts and operations issues.[14]  DeWitt reported directly to Gonsoulin, who continued to work for Sea Mar Management, Inc. after it was purchased by Nabors.[15]  Gonsoulin left the company in January 2002 and DeWitt began reporting directly to Eugene Isenberg ("Isenberg"), Chairman and CEO of NII.[16]

Following the purchase, NII continued to own, operate, and market all of its vessels through its wholly owned subsidiary, Sea Mar Management, Inc.[17]  During the entire time period outlined above, Sea Mar Management, Inc. owned all of the Nabors vessels and all MSA's with End Users.[18]

## II.    The Nabors Inversion.

Nabors Industries Ltd. ("NIL"), the ultimate parent corporation, was formed and relocated to Bermuda in 2002 as part of a process referred to by Nabors as an "inversion."[19]  The

---

[10] Rec. Doc. 587, Testimony of Plaisance, p. 43:19-22.
[11] Rec. Doc. 588, Testimony of DeWitt, p. 63:13-18.
[12] Rec. Doc. 588, Testimony of DeWitt, p. 61:22-24.
[13] Rec. Doc. 589, Testimony of Doerre, p. 21:25-22:19.
[14] Rec. Doc. 588, Testimony of DeWitt, p. 56:20-22; Rec. Doc. 588, p. 57:14-22, 62:12-16.
[15] Rec. Doc. 588, Testimony of DeWitt, p. 62:17-24.
[16] Rec. Doc. 588, Testimony of DeWitt, p. 62:25-63:12.
[17] Rec. Doc. 587, Testimony of Plaisance, p. 44:18-21.
[18] Rec. Doc. 587, Testimony of Plaisance, p.60:17-20.
[19] Rec. Doc. 587, Testimony of Plaisance, p. 44:22-45:3; 157:22-158:12.

reason for the move "offshore" was so that NIL could avoid paying high U.S. taxes on the majority of the income derived from its numerous subsidiaries.[20] This inversion caused Nabors to become a foreign entity, Nabors Industries Ltd., and prevented it from operating its U.S. flagged vessels in coastwise trade under then existing U.S. law.[21]

In order to get around this restriction on operating in coastwise trade, Sea Mar Management, Inc. and its vessel operations were split into *four* entities: Sea Mar Division of Pool Well Services (predecessor to NWS), Sea Mar Investco, LLC ("Investco"), SMM and Nabors U.S. Finance, LLC.  ("Nabors Finance")  The express and sole purpose of this reorganization was to allow the Nabors' vessels to continue to be operated in U.S. coastwise trade.[22]  As testified to by NIL's General Counsel, Laura Doerre ("Doerre"); "That entity (Investco) was created because one of the stumbling blocks to the reorganization in Bermuda was that the Sea Mar business conducts coast wise trade in the United States, and there is a requirement under the Jones Act…But, under the Jones Act, they look to ultimate ownership. And so, the fact that the ultimate ownership several layers up the corporate chain was going to be a Bermuda company, it would have prohibited that entity from continuing to do business in the United States.  So we effectively had to sell seventy-five percent of it to a U.S. person."[23]

DeWitt was named the president of Sea Mar Division of Pool Well Services at the time that it was created after the inversion and also served on the board of managers of Investco as Nabors Industries representative.[24]  DeWitt testified that Isenberg, who assumed the role of chairman and CEO of NIL, was his direct supervisor.[25]

---

[20]Rec. Doc. 589, Testimony of Doerre, pp. 10-11
[21] Rec. Doc. 587, Testimony of Plaisance, p. 45:7-11
[22] Rec. Doc. 588, Testimony of DeWitt, p. 65:22-66:18.
[23] Rec. Doc. 589, Testimony of Doerre, p. 16
[24] Rec. Doc. 588, Testimony of DeWitt, p. 59:21-60:8, 220:13-221:12.
[25] Rec. Doc. 588, Testimony of DeWitt, p. 231:25-232:2.

As a result of the inversion, ownership of the Nabors vessels was transferred through a lease finance to Nabors Finance whose sole role was to own the vessels and bareboat charter them only to SMM.[26]  Nabors Finance was a U.S. company but was ultimately owned by NIL.  A loophole in U.S. Law allowed foreign investors to purchase U.S. flag vessels, but it would not allow Nabors Finance to operate the vessels because Nabors Finance was ultimately owned by a "foreigner", NIL.  NIL retained title to all Nabors vessels through its ownership of Nabors Finance.[27]

Consequently, at the time of the inversion, all Nabors' vessels were immediately bareboat chartered by Nabors Finance to SMM for a five year term.  SMM was wholly owned by Investco and all of SMM's profits were swept into Investco's bank account.  Investco was just a shell and had no employees and was set up solely to "own" SMM.[28]  Investco was owned 75% by the Jesselson interests (Michael Jesselson was a U.S. citizen and a long-time family friend of Isenberg) and ultimately 25% by NIL through a series of subsidiaries.[29]  Because Investco had 75% U.S. ownership it could then lawfully operate the Nabors vessels in coastwise trade, while other Nabors' entities could not do so.  Under Nabors' inversion scheme, SMM then immediately time chartered all Nabors vessels to NWS for a five year term.[30]  NWS remained a company ultimately wholly owned by NIL, through a series of subsidiaries.  NWS was the only entity with which SMM entered into time charters.[31]

---

[26] Rec. Doc. 587, Testimony of Plaisance, p. 47:5-7; Rec. Doc. 588, Testimony of DeWitt, p. 68:10-21.

[27] Rec. Doc. 589, Testimony of Doerre, p. 24:4-15.

[28] Rec. Doc. 564, Uncontested Fact No. 25.

[29] Rec. Doc. 590, Testimony of Powell, p. 141, ll. 1-8.

[30] Rec. Doc. 588, Testimony of DeWitt, p. 79:17-23.

[31] Rec. Doc. 588, Testimony of DeWitt,  p. 109:7-13; Rec. Doc. 590, Testimony of John Powell, p. 147: 2-3.

When SMM was formed it had no capital.[32]  NWS paid all of SMM's expenses incurred in operating the Nabors vessels and paid SMM a management fee of $100/day per vessel for its services.[33]  SMM relied solely on NWS to provide funds to carry out SMM operations.

Because NWS possessed all of the MSA's, it was by Nabor's design the only entity that marketed the Nabors vessels to End Users.[34]  NWS negotiated and received the market rate for its time charter to the End User.  Nabors Finance was paid a flat rate for the bareboat charter of Nabors vessels to SMM, no matter the rate obtained by NWS from the End User.[35]  This rate did not depend on market conditions, utilization of the vessels, or any other external factors and was paid "come hell or high water."[36]  SMM received the money to pay the flat charter rate to Nabors Finance from NWS.[37]  This arrangement allowed all of the funds generated by the Nabors vessels, excluding the $100 per day management fee paid to SMM and the operating expenses, to remain under the Nabors' corporate umbrella.  Because the Jesselson interests had no ownership of NWS or Nabors Finance, 100% of the profits realized by NWS and Nabors Finance stayed within the NIL umbrella.[38]  If SMM had operated and marketed the Nabors vessels as it did under the pre-inversion corporate setup where Sea Mar Management, Inc. owned, operated and marketed the vessels, NIL would ultimately have received only 25% of the profits through its ownership of SMM.  Jesselson would have pocketed the other 75%.

The board of managers of Investco consisted of Dewitt, Jesselson and Jesselson's assistant, Judy Kelly.  Dewitt was the representative of Nabors' 25% ownership interest,

---

[32] Rec. Doc. 590, Testimony of  Powell, p. 146: 21-23.
[33] Rec. Doc. 587, Testimony of Plaisance, p. 48:8-25; Rec. Doc. 588, Testimony of DeWitt, p. 78:21-79:12; Exhibit P-28.
[34] Rec. Doc. 588, Testimony of DeWitt, p. 109:14-21.
[35] Rec. Doc. 588, Testimony of DeWitt, p. 91:10-3.
[36] Rec. Doc. 587, Testimony of Plaisance, p. 52:15-18; Rec. Doc. 588, p. 92:8-18, 95:25-96:22.
[37] Rec. Doc. 588, Testimony of DeWitt, p. 90:19-91:3.
[38] Rec. Doc. 588, Testimony of DeWitt, p. 112:8-20.

*although DeWitt was unsure of the Nabors entity that he was actually representing.*[39]   The SMM board of managers was comprised of Jesselson, Kelly, Plaisance and Powell.[40]   The Investco board signed off on all policy and budget issues concerning SMM as SMM's operating agreement specifically provided that Invesco had "the exclusive right to manage . . . [SMM's] . . . business."[41]   Investco and SMM held joint board meetings.[42]   Plaisance and Powell typically attended the board meetings of Investco.[43]   Other Nabors' personnel such as Isenberg and Nabors' attorneys, such as Jim Lank ("Lank"), also attended the SMM/Investco board meetings.[44]

## III.    The ATEL Vessels.

ATEL is an equipment leasing company whose only office is in San Francisco, California.   It finances and leases thousands of different types of equipment.[45]   ATEL first entered the vessel leasing business in the late 1990's when it executed a sale-lease back with Seacor.[46]   The four vessels of interest in this case, the M/V CAPE KUMUKAHI, M/V CAPE ATLAS, M/V CAPE HANAMANOIA and M/V CAPE KALA KANE, (the "ATEL Vessels")[47] were originally owned by Seacor, but were later purchased by ATEL and bareboat chartered back to Seacor.[48]   Under this arrangement, ATEL was paid a flat monthly fee on the bareboat charter, much like Nabors Finance was paid by SMM for Nabors vessels, and Seacor was

---

[39] Rec. Doc. 588, Testimony of DeWitt, p. 70:13-22, 84:15-25.
[40] Rec. Doc. 588, Testimony of DeWitt, p. 70:25-71:8.
[41] Rec. Doc. 564, Uncontested Fact No. 28; Rec. Doc. 588, Testimony of DeWitt, p. 87:19-25.
[42] Rec. Doc. 588, Testimony of DeWitt, p. 71:9-18.
[43] Rec. Doc. 588, Testimony of DeWitt, p. 72:3-6.
[44] Rec. Doc. 588, Testimony of DeWitt, p. 72:9-17.
[45] Rec. Doc. 587, Testimony of Monroe, p. 216,-217;221
[46] Rec. Doc. 587, Testimony of Monroe, p. 218:14-15.
[47] These vessels originally had different names.   The names were changed later when SMM began to manage them as is discussed later.   All of Sea Mar's vessels were named after "CAPES" and the ATEL vessels names were changed to "CAPES" to fit with the other Sea Mar managed vessels names, the Nabors vessels. Testimony of Plaisance, Rec. Doc. 587, p. 119:2-5.
[48] Rec. Doc. 587, Testimony of Monroe, p. 218:23-219:3.

responsible for the costs and expenses of operating the ATEL Vessels.[49]  Seacor bore all of the risk under this arrangement because it was responsible for all costs, and it had to pay ATEL every month regardless of whether the vessel was working or not.[50]  At the time that ATEL purchased the ATEL vessels, it had no experience operating or chartering vessels and had no knowledge of the "market" and acceptable charter rates.[51]

When ATEL vessels came off charter from Seacor, the market was down.[52]  ATEL could not remarket or sell the vessels due to market conditions, so it placed the vessels in storage at a safe harbor at Trico in Louisiana.[53]  Plaisance happened to spot the ATEL Vessels at Trico and contacted Tom Monroe ("Monroe"), Senior Vice President at ATEL, in October 2003 to inquire as to whether ATEL was interested in selling one of the vessels.[54]  Since ATEL did not want to sell any of the vessels, Plaisance asked Monroe if SMM could manage the ATEL Vessels and market them to End Users.[55]

## IV.   The Negotiation And Execution Of The Master Bareboat Charter Agreements ("MBCA's") Between ATEL And SMM.

Plaisance represented to ATEL that SMM managed and marketed a fleet of vessels owned by Nabors and that SMM could do something similar for ATEL.[56]  Monroe and Plaisance first discussed entering into a management type arrangement in which SMM would handle all operations of the vessels and charter them directly to End Users.[57]  Plaisance told Monroe he had

---

[49] Rec. Doc. 587, Testimony of Monroe, p. 219:4-7.
[50] Rec. Doc. 587, Testimony of Monroe, p. 219:14-25.
[51] Rec. Doc. 587, Testimony of Monroe, p. 220:10-23.
[52] Rec. Doc. 587, Testimony of Monroe, p. 222:19-25.
[53] Rec. Doc. 587, Testimony of Monroe, p. 222:19-25.
[54] Rec. Doc. 587, Testimony of Monroe, p. 223:9-16.
[55] Rec. Doc. 587, Testimony of Monroe, p. 224:3-6.
[56] Rec. Doc. 587, Testimony of Monroe, p. 224:9-13.
[57] Rec. Doc. 587, Testimony of Monroe, p. 226:5-11; Rec. Doc. 588, p. 52:20-53:8.

a very good relationship with and a good network of End Users.[58] Monroe and Plaisance continued negotiations for approximately eight months.[59]   Throughout the eight month negotiation of the MBCA's, SMM never told ATEL that SMM did not have the ability to do the marketing[60] and that NWS; not SMM, would actually be marketing the ATEL Vessels[61].

Prior to entering into the MBCA's, ATEL performed due diligence of SMM.  Because ATEL had no experience operating vessels and no experience of the "market", Monroe consulted with an expert surveyor, Phil Latham, who represented that SMM was a well-respected company.[62]  ATEL's chief credit officer, Russ Wilder, also visited Plaisance in New Iberia and met with the SMM staff.[63]  Monroe also visited SMM's New Iberia facility for two days in June of 2007 before the MBCA's were executed.[64]

Initially, the MBCA's were being negotiated between Monroe and Plaisance with legal advice being provided to SMM by an outside attorney, Tom Getten.[65]  However, after a period of time, DeWitt told Plaisance that "Nabors wanted their attorney to handle negotiations . . ." and Plaisance was to begin forwarding comments to the contract to DeWitt who personally worked on the negotiation of the MBCA's with Jim Lank, a Nabors in-house attorney.[66]  ATEL was never made aware that anyone with NWS, including DeWitt, or Nabors' in-house legal staff had any role in negotiating the terms of the MBCA's.[67]  DeWitt reviewed drafts and the final version

---

[58]  Rec. Doc. 587, Testimony of Monroe, p. 234.
[59]  Rec. Doc. 587, Testimony of Plaisance, p. 64:18-20.
[60]  Rec. Doc. 587, Testimony of Plaisance, p. 66:13-67:3; Rec. Doc. 587, Testimony of Monroe, p. 227: 16-20
[61]  Rec. Doc. 587, Testimony of Plaisance, pp. 66: 13-23; 67: 16-21, 161:1-5
[62]  Rec. Doc. 587, Testimony of Monroe, p. 225:14-23.
[63]  Rec. Doc. 587, Testimony of Monroe, p. 220; p. 225:14-23.
[64]  Rec. Doc. 588, Testimony of Monroe, p. 30:14-31:1.
[65]  Rec. Doc. 587, Testimony of Plaisance, p. 71:13-23; 74:12-17.
[66]  Rec. Doc. 587, Testimony of Plaisance, p. 72, 3-6; p. 74:3-22.
[67]  Rec. Doc. 589, Testimony of Morais, p. 150: 15-19; p. 150:  25-151:2

of the MBCA's and had discussions with Lank about the MBCA's.[68]  Plaisance only acted as a go-between between ATEL and DeWitt and Lank.[69]  Jesselson, the President of SMM, had no involvement with the negotiations of the MBCA's, outside of discussions at board meetings.[70]

The Investco board, DeWitt and Jesselson, initially approved Plaisance exploring the possibility of managing vessels for an owner other than Nabors Finance, like ATEL.  They ultimately approved SMM's entering into the MBCA's between ATEL and SMM, which had been renamed during this period from a management agreement to a bareboat charter agreement while retaining all of the management agreement provisions.[71]  The MBCA's were finally executed July 7, 2004.[72]

Under the terms of the MBCA's, ATEL was responsible for all operating expenses of the ATEL Vessels which expenses were paid to SMM in advance in accordance with an estimated budget that was prepared by SMM.[73]  SMM was also paid a management fee by ATEL of $300.00 per day plus an incentive fee of 5% of any amount earned by the ATEL Vessels in excess of $5,000.00 a day.[74]  SMM initially requested a higher fee, but the final management fee was negotiated to include a lower guaranteed daily rate plus the incentive fee in order to provide SMM with a marketing incentive to keep costs low and to ensure that SMM got the best charter rates possible for the ATEL Vessels.[75]  The higher the charter rate SMM got for the ATEL Vessels, the more money SMM would earn.  Plaisance testified that what SMM was to be paid by ATEL, which was three times as much as ATEL was being paid by NWS for operating

---

[68] Rec. Doc. 588, Testimony of DeWitt, p. 121:25-122:9.
[69] Rec. Doc. 587, Testimony of Plaisance, p. 75:18-23.
[70] Rec. Doc. 587, Testimony of Plaisance, p. 78:10-15.
[71] Rec. Doc. 587, Testimony of Plaisance, p. 65:24-66:4.
[72] Rec. Doc. 564, Uncontested Fact No. 1.
[73] Rec. Doc. 587, Testimony of Plaisance, p. 75:8-17; Rec. Doc. 588, Testimony of DeWitt, p. 122:10-22.
[74] Rec. Doc. 587, Testimony of Plaisance, p. 79:23-80:3.
[75] Rec. Doc. 587, Testimony of Monroe, p. 227:3-7.

Nabors' vessels, was fair and reasonable and, in fact, was far better for SMM than a flat fee arrangement would have been because of the market conditions at the time and the 5% incentive fee.[76]

Under the arrangement with ATEL, SMM had no risk and could not lose any money.[77] ATEL was responsible for all operating expenses and also bore the risk of market conditions affecting the rate and utilization of the vessels.[78]   Further, SMM was to be paid its management fee regardless of whether the ATEL Vessels were on or off charter.[79]   Additionally, if the End User did not pay and SMM did its best to collect with no result, ATEL ultimately bore the risk and would not pursue SMM for the unpaid charter hire.[80]

Throughout the negotiations of the MBCA's, SMM knew that NWS was going to be marketing the ATEL Vessels.[81]   However, through initial discussions with DeWitt, Plaisance understood that NWS was going to be compensated for its marketing services through NIL's ultimate 25% ownership interest in Investco/SMM.[82]   Plaisance and DeWitt never discussed any other form of compensation, such as a 10% markup, for NWS' marketing services during the MBCA negotiations, and in fact not for almost five months after the MBCA's were signed as is discussed later.[83]   Although Plaisance and DeWitt were aware that NWS was going to be marketing the vessels, they recognized that SMM was still ultimately responsible and was being paid for the marketing of the ATEL Vessels.[84]   Although both NWS and SMM knew that SMM

---

[76] Rec. Doc. 587, Testimony of Plaisance, p. 81:16-82:1.
[77] Rec. Doc. 587, Testimony of Plaisance, p. 83:12-16.
[78] Rec. Doc. 587, Testimony of Monroe, p. 224:16-25.
[79] Rec. Doc. 587, Testimony of Monroe, p. 228:15-23.
[80] Ex. P-1 p. 17 Article 8(c).  Rec. Doc. 587, Testimony of Plaisance, p. 94.
[81] Rec. Doc. 587, Testimony of Plaisance, p. 84:17-85:9.
[82] Rec. Doc. 587, Testimony of Plaisance, p. 84:17-85:9.
[83] Rec. Doc. 587, Testimony of Plaisance,  p. 85:10-24.
[84] Rec. Doc. 587, p. 86:4-7; Rec. Doc. 588, Testimony of DeWitt, p. 181:19-20.

did not have the capability to market the vessels,[85] no one at SMM ever told ATEL that SMM could not fulfill this obligation under the MBCA's or that NWS was going to market the ATEL Vessels in SMM's stead.[86]   Further, at the time that the MBCA's were executed on July 7, 2004, there was no agreement in place between SMM and NWS that would allow for NWS to market or subcharter the ATEL Vessels.[87]

**V.    The ATEL Vessels Go Into Service.**

When the ATEL Vessels first went into service, SMM issued the invoices directly to the End Users as was required by the MBCA's.[88]   However, NWS was the party negotiating and setting the rates that were being charged to the End Users.[89]   NWS would enter into a time charter with an End User at a rate determined by NWS and agreed to by the End User (the market rate) and SMM would then send an invoice to the End User reflecting this rate.[90]   Initially there was no difference between the amount invoiced to the End User and the amount that was deposited into the ATEL/SMM lockbox.[91]   Under the MBCA's all payments for the charter of the ATEL Vessels were to be deposited by SMM into the ATEL/SMM lockbox.[92]   For instance, Exhibit P-22 demonstrates that the charter hire received from the End User was the exact same amount paid to ATEL for the first three charters for the vessel CAPE HANAMANOIA for the time period 12/9/04 to 1/9/05.[93]

---

[85] Rec. Doc. 588, Testimony of DeWitt, p. 127:19-25; p. 182:16-23.

[86] Rec. Doc. 587, Testimony of Plaisance, p. 160:23-161:12; 227:16-20.

[87] Rec. Doc. 588, Testimony of DeWitt,  p. 128:23-129:2.

[88] Rec. Doc. 587, Testimony of Plaisance,  p. 110:8-12.

[89] Rec. Doc. 587,  Testimony of Plaisance, p. 110:15-22.

[90] Rec. Doc. 587, Testimony of Plaisance,  p. 111:10-21;  Rec. Doc. 588, Deposition of DeWitt, p. 101

[91] Rec. Doc. 587, Testimony of Plaisance, p. 112:7-14; 116:2-11.

[92] Ex P-1, p. 25; Testimony of Plaisance, Rec. Doc. 587, p. 93: 11-20; Rec. Doc. 564, Uncontested Facts Nos. 11, 12 and 13.

[93] Exhibits P-19 to P-21 were stipulated by the parties as an accurate compilation of all of the charters of the ATEL vessels showing the rates paid by the End Users as well as the rates received by SMM.

However with SMM issuing invoices for the ATEL Vessels and NWS issuing invoices for the Nabors vessels, End Users allegedly became confused because payment for the charter of Nabors Vessels was being made to NWS at its office in Houston and for the ATEL Vessels to the ATEL/SMM lockbox.[94]   As a result of this alleged confusion, NWS and SMM, without the approval of ATEL and contrary to the direct mandate of the MBCA's, agreed that going forward NWS would generate all invoices to the End Users.[95]

SMM attached as a schedule to the MBCA's a list of approximately eighty (80) End Users that NWS had existing MSA's with for the time charter of vessels.[96]   ATEL agreed that SMM could charter to the End Users on the Schedule without advance permission from ATEL at rates determined by SMM as ATEL had performed a credit review on all of the End Users on the Schedule.[97] When a new charter opportunity presented itself for an ATEL vessel, Plaisance therefore did not always contact ATEL to inform it of the rate or the identity of the End User if the End User was on the Schedule.[98]   Plaisance never called Monroe or anyone at ATEL to make sure that a rate quoted by NWS was acceptable.[99]   However, Plaisance did have verbal communications "every now and then" with Monroe regarding longevity of charters and the current state of the market.[100]

The only time that Plaisance called ATEL to specifically discuss rates was when there was a down market and Plaisance was quoted a rate from NWS that was less than the ATEL

---

[94] Rec. Doc. 587, Testimony of Plaisance, p. 111:22-112:1.
[95] Rec. Doc. 587, Testimony of Plaisance, p. 112:1-6.
[96] Ex. P-1, Schedule II
[97] Rec. Doc. 588, Testimony of Monroe, p. 52: 4-8..
[98] Rec. Doc. 587, 140:5-13.
[99] Rec. Doc. 587, Testimony of Plaisance, p. 192:23-193:6; Rec. Doc. 587, Deposition of Monroe, p. 233: 9-13..
[100] Rec. Doc. 587, Testimony of Plaisance, p. 112:15-113:4.

Vessels had previously received.[101]   Both Plaisance and Monroe testified that when Plaisance communicated the identity of the charterer of the ATEL Vessels to Monroe during these conversations, Plaisance always identified the charterer as the End User – not NWS - and told Monroe that the rate that SMM was getting the rate was the rate the vessel was earning from the End User.[102]   Plaisance testified that he thought the amount the NWS salesman told him the vessel was earning <u>was</u> the rate the End User was paying.[103] Monroe relied on Plaisance's expertise in determining if the rates earned by the ATEL Vessels were reasonable since ATEL had no experience with respect to the market in the Gulf of Mexico for the leasing of vessels.[104] Monroe trusted Plaisance.[105]

Shortly after NWS began invoicing the End Users directly and just before an SMM/Investco board meeting in early December 2007, it became apparent to Plaisance "that there was some type of fee markup, because we (SMM and NWS) were doing an on-charter report that showed two different things."[106]   Specifically, the on-charter forms showed two different rates; a higher rate charged to the End User by NWS and a lower rate being remitted to SMM by NWS.[107]   When Plaisance questioned NWS about this fee markup, Plaisance began receiving on-charter forms from NWS with the higher rate being charged to the End User <u>blacked out</u>.[108]   On all of the blacked out forms, the line where the higher rate charged to the End User had been listed previously was now blacked out.[109]   Plaisance ". . . figured there was

---

[101] Rec. Doc. 587, Testimony of Plaisance, p. 194:2-10.
[102] Rec. Doc. 587, Testimony of Plaisance, p. 113: 5-7; 140; 14-21; Testimony of Monroe, 233:22-234:8.
[103] Rec. Doc. 587, Testimony of Plaisance, p. 140:
[104] Rec. Doc. 587, Testimony of Plaisance, p. 233:14-17; Rec. Doc. 588, Testimony of Monroe,
 p. 54:10-14.
[105]  Rec. Doc. 587, Testimony of Monroe, p. 235.
[106] Rec. Doc. 587, Testimony of Plaisance, p. 116:12-18; pp. 139-140.
[107] Rec. Doc. 587, Testimony of Plaisance, p. 138:19-23; 208:20-23.
[108] Rec. Doc. 587, Testimony of Plaisance, p. 121:14-25; 122:7-8; 208:9-16.
[109] Rec. Doc. 587, Testimony of Plaisance, p. 210:1-5.

something they didn't want me to see."[110]   When Plaisance asked why the lines were blacked

out, he was told by NWS employees that he "wasn't entitled to that information."[111]   Plaisance

suspected NWS was keeping the difference in the amount paid by the End User to NWS and the

amount paid to SMM by NWS.[112]

## VI.   DeWitt's Plan For How NWS Would Be Paid For Marketing.

Prior to Plaisance's "suspicion" about a markup, he had an understanding as to how NWS

would be compensated for the marketing the ATEL Vessels.   DeWitt, as previously discussed,

originally proposed an entirely different arrangement than the one that was ultimately carried out

by NWS and SMM.[113]   Initially DeWitt told Plaisance that NWS would be satisfied with the

25% interest NIL had in Investco/SMM as adequate compensation for NWS' marketing the

ATEL Vessels.   In or around May 30, 2004, DeWitt intended that NWS would enter into a

"marketing agreement" with SMM and be paid $50 per day when the ATEL Vessels were on-

charter.[114]   Later DeWitt suggested that under his plan which was memorialized in DeWitt's

November 30, 2004 email, SMM, not NWS, would have privity of contract with the End

Users.[115]   This was to be accomplished through an assignment of the MSA's with the End Users

from NWS to SMM each time one of the ATEL Vessels was chartered.[116]   NWS was to be the

---

[110] Rec. Doc. 587, Testimony of Plaisance, p. 210.
[111] Rec. Doc. 587, Testimony of Plaisance, p. 210:1-10.
[112] Rec. Doc. 587, Testimony of Plaisance, p. 138.
[113] Exhibit P-10, Email Chain RE: ATEL-Master Bareboat Charter Agreement at November 30, 2004 email from DeWitt's Assistant, Loran Augresane, to Outside Counsel and James Lank.
[114] Rec. Doc. 588, Testimony of DeWitt, p. 125:24-126:6.
[115] Exhibit P-10, Email Chain RE: ATEL-Master Bareboat Charter Agreement at November 30, 2004 email from DeWitt's Assistant, Loran Augresane, to Outside Counsel and James Lank; Rec. Doc. 588, p. 134:10-135:11.
[116] Exhibit P-10, Email Chain RE: ATEL-Master Bareboat Charter Agreement at November 30, 2004 email from DeWitt's Assistant, Loran Augresane, to Outside Counsel and James Lank; Rec. Doc. 588, p. 135:12-136:21.

"sales agent" and was not going to be involved in the time chartering and billing process.[117] SMM would invoice the End User directly and be paid the full amount of the time charter.[118]

## VII.    Isenberg Steps In – The 10% Skimming Scheme Begins

However, DeWitt's ideas as to how NWS would be compensated for marketing the ATEL Vessels changed after he received a call from Isenberg that set into motion the events that ultimately led to this lawsuit.  On a crisp, cool fall morning, DeWitt received a phone call from Isenberg instructing DeWitt to add 10% more to all charter hire when chartering to the End User than NWS was paying to SMM.[119]  ATEL would as a result ultimately receive 10% less than the market rate negotiated by NWS with the End User. DeWitt received Isenberg's call after the November 30, 2004 email in which he set out his plan to act as a "marketing agent" for the ATEL Vessels at a rate of $50 per day.[120]  It was clear that Isenberg was "hot under the collar" when he found out what had been negotiated in the MBCA's.[121]  Isenberg testified that he had not become aware of the terms of the MBCA's until they were signed.[122]  Isenberg was mad that Nabors was not making enough money from a contract negotiated for eight months and signed five months before.  Ironically, DeWitt did not recall that Jesselson, the majority owner (at least on paper) of Investco/SMM, had any concerns with the terms of the MBCA's.[123]  In fact, under DeWitt's original plan, Investco, not Nabors, was to receive 75% of SMM's profits from managing the ATEL Vessels, which provided the economic impetus for Isenberg's skimming scheme.

---

[117] Exhibit P-10, Email Chain RE: ATEL-Master Bareboat Charter Agreement at November 30, 2004 email from DeWitt's Assistant, Loran Augresane, to Outside Counsel and James Lank.
[118] Rec. Doc. 588, Testimony of DeWitt, p. 136:23-137:7.
[119] Rec. Doc. 588, Testimony of DeWitt, p. 125:24-126:6; P-15, p. 2, email from Lank to Ross..
[120] Rec. Doc. 588, Testimony of DeWitt,  p. 145:20-146:6.
[121] Testimony of Lank, Rec. Doc. 591, p. 24: 10-16.
[122] Testimony of Isenberg, Rec. Doc. 591, p. 137: 3-8.
[123] Rec. Doc. 588, Testimony of DeWitt, p. 183:21-24.

DeWitt passed along Isenberg's directive verbatim to Lank and had numerous discussions with Lank regarding the implementation of Isenberg's 10% skimming scheme.[124] Lank and DeWitt had additional conversations with Isenberg regarding Isenberg's directive and drafted a proposed amendment to the MBCA at Isenberg's direction designed to carry out Isenberg's directive which would have allowed NWS to keep the 10% markup.[125]

DeWitt notified the boards of Investco and SMM of Isenberg's directive at a board meeting that occurred in early December 2007 shortly after the Isenberg/DeWitt phone call.[126] Plaisance, who had previously had a suspicion of the markup scheme because of the "blacked out" invoices, brought his suspicions to the board at the meeting.[127] DeWitt informed those present at the board meeting - Jesselson, Lank, Plaisance and Powell - of the forthcoming amendment to the MBCA that would have allowed NWS to market the ATEL Vessels at whatever rate they chose and directly invoice the End User.[128] DeWitt told Plaisance that NWS would begin marking up the charter hire earned by the ATEL Vessels and handling all invoicing.[129] Lank was going to draft the proposed amendment to the MBCA's and Plaisance was to pass it on to ATEL.[130]

Plaisance objected to this plan advising the board, including DeWitt, that the intent of the MBCA's did not allow a markup by NWS for marketing services.[131] The management fee paid by ATEL to SMM included payment for marketing. Plaisance testified that any fee that NWS would charge for marketing would be included in the management fee SMM received from

---

[124] Rec. Doc. 588, Testimony of DeWitt, p. 157:4-158:1.
[125] Rec. Doc. 588, Testimony of DeWitt, p. 158:2-6, 184:20-23.
[126] Rec. Doc. 588, Testimony of DeWitt, p. 159, p. 172 Ex. P-8.
[127] Rec. Doc. 587, Testimony of Plaisance, p. 22.
[128] Rec. Doc. 587, Testimony of Plaisance, p. 123:1-15.
[129] Rec. Doc. 587, Testimony of Plaisance, p. 123:16-20.
[130] Rec. Doc. 587, Testimony of Plaisance, p. 123:16-20.
[131] Rec. Doc. 587, Testimony of Plaisance, p. 19-25; Rec. Doc. 588, p. 159:6-161:22.

ATEL.[132]   According to Plaisance, NWS provided no additional services in exchange for this 10% marketing fee other than those marketing services that were already negotiated and being paid for by ATEL.[133]   Because a markup "wasn't part of the intent of the original discussions and contract negotiation and it wasn't what Van and I talked about," Plaisance testified that ATEL would have to be informed and the contract would now have to be reworked.[134]   After Plaisance expressed his objections to the markup plan, there was no more discussion. DeWitt basically said "that's what was going to happen."[135]

Although DeWitt testified that he thought NWS had "to have something in place to time charter these vessels,"[136] NWS had in fact begun time chartering and skimming 10% of the charter hire weeks before the MTCA was executed by SMM and NWS.[137]

## VIII.   The Proposed Amendment to the MBCA's

After the amendment to the MBCA's was drafted by Lank, it was forwarded to DeWitt.[138]   DeWitt understood that the purpose of this amendment, or at least the portion of the amendment regarding the ability of NWS to charter at rates set at its sole discretion, was to allow NWS to implement Isenberg's 10% skimming scheme.[139]   DeWitt drafted a "CYA" memorandum dated December 14, 2004 to members of Nabors' in-house legal staff shortly after Lank drafted the amendment to the MBCA clearly spelling out Isenberg's directives (the "CYA

---

[132] Rec. Doc. 587, Testimony of Plaisance, p. 138.

[133] Rec. Doc. 587, Testimony of Plaisance, p. 138:5-16.

[134] Rec. Doc. 587, Testimony of Plaisance, p. 123:21-124:2.

[135] Rec. Doc. 587, Testimony of Plaisance, p. 124:9-13.

[136] Rec. Doc. 588, Testimony of DeWitt, p. 200:6-201:6.

[137] The M/V CAPE KUMUKAHI went into service on January 2, 2005 under a time charter to Devon Energy Corporation. Exhibit P-19.  Under the time charter with Devon, NWS was being paid $6,000.00 per day for the use of the vessel.  *Id.*  However, the rate being reported to ATEL and charged to NWS and SMM was $5,500.00 per day.  *Id.* Another time charter was entered into beginning January 10, 2005 for the M/V CAPE KUMUKAHI at the same rates as the Devon time charter.  *Id.*  Both of these time charters in which NWS was skimming 10% of the charter hire were entered into prior to the execution of the MTCA by NWS and SMM on January 19, 2005.

[138] Exhibit P-8; Rec. Doc. 588, Testimony of DeWitt, p. 164:2-20.

[139] Rec. Doc. 588, Testimony of DeWitt, p. 165:6-11, 165:18-167:16.

Memo").[140]   In the CYA Memo, DeWitt wrote that Isenberg instructed him that the $300 per day management fee that SMM had negotiated with ATEL over the course of nearly eight months was not sufficient for the services being provided by Nabors' entities.[141]   The CYA Memo further acknowledged that SMM did not have the capability of providing sales, marketing, or contract services to any entity other than NWS.[142]   DeWitt wrote that he had been instructed to amend the MBCA's to establish these goals.[143]   Specifically, the amendment to the MBCA's was to allow NWS to subcharter the ATEL vessels to End Users at rates set at NWS' sole discretion.[144]   DeWitt also confirmed that Isenberg instructed DeWitt that NWS was to receive a minimum of $500 per day for the marketing of the ATEL vessels, which was referring to the 10% markup because at that time the market rate was $5000/day, or unwind the contract.[145]

The purpose of the CYA Memo was to provide Nabors' attorneys with background in case ATEL did not approve the amendment and it became necessary to unwind the contract (although there was no basis to do so and any such effort would be in further breach).[146]   At the time the CYA Memo was written, NWS and SMM still had no contractual agreement documenting NWS's role in marketing the ATEL vessels.[147]   The CYA memo makes it clear that NWS did not believe that it could subcharter the vessels at a higher rate without the benefit of this proposed amendment.

DeWitt, on behalf of the board of SMM/Investco, forwarded the proposed amendment to the MBCA's to Powell and Plaisance.  Plaisance passed it on to Monroe without studying it, and

---

[140] Exhibit P-12; Rec. Doc. 588, Testimony of DeWitt, p. 174:20-175:2, 176:17-177:6; 183:8-10, 187:1-17.
[141] Exhibit P-12.
[142] *Id.*
[143] *Id.*
[144] *Id.*
[145] *Id.*; Rec. Doc. 588, Testimony of DeWitt,  p. 187:1-17.
[146] *Id.*
[147] Rec. Doc. 588, Testimony of DeWitt,  p. 185:13-21.

Plaisance had no input into the proposed amendment other than to pass it along to ATEL.[148] During Plaisance's conversation with Monroe regarding the proposed amendment, Plaisance did not inform Monroe of Isenberg's 10% markup scheme despite the fact he knew or suspected that this was the reason behind the amendment.[149]   In fact, the only conversation that Monroe ever had with Plaisance was limited to the fact that SMM was sending over a proposed amendment.[150]

After receiving the proposed amendment, Monroe forwarded it to Vasco Morais, General Counsel at ATEL.[151]   Morais provided some initial comments to the proposed amendment and forwarded these on to Monroe asking Monroe to find out from SMM why the amendment was being proposed.[152]   Monroe later forwarded these comments to Plaisance.[153]   This was the last contact that Monroe had with Plaisance regarding the proposed amendment.[154]   After receiving ATEL's comments, Plaisance passed them on to DeWitt who then forwarded them to Lank.[155] No further action was taken by Nabors with respect to the memo, and the proposed amendment was never signed by ATEL.[156]

As Morais testified, ATEL would never have agreed to the proposed amendment as drafted.   Regarding the portion of the proposed amendment dealing with the potential role of NWS in chartering the ATEL Vessels, Morais testified that he had "discomfort that this entity who we had really no dealings with would somehow be able to complete the obligations of the company that we had contracted with.   And I just didn't see that as a possibility and could not

---

[148] Exhibit P-6; Rec. Doc. 587, Testimony of Plaisance, p. 133:23-134:6; p. 137:15-17; Rec. Doc. 588, Testimony of DeWitt, p. 170:20-172:18.

[149] Rec. Doc. 587, Testimony of Plaisance, p. 138:1-4.

[150] Rec. Doc. 588, Testimony of Monroe, p. 13:24-14:4.

[151] Rec. Doc. 588, Testimony of Monroe, p. 13:14-17.

[152] Exhibit P-14; Rec. Doc. 588, Testimony of Monroe, p. 14:5-7.   Rec. Doc. 589, Testimony of Morais, p. 155: 19-23.

[153] Exhibit P-14; Rec. Doc. 588, Testimony of Monroe, p. 14:24-15:2.

[154] Rec. Doc. 588, Testimony of Monroe, p. 19:16-19.

[155] Exhibit P-14;  Rec. Doc. 588, Testimony of DeWitt, p. 193:22-194:22.

[156] Rec. Doc. 588, Testimony of Monroe, p. 19:20-21.

understand the reason for that."[157]   Regarding Morais' specific comments to the proposed amendment, Morais explained that while he did not specifically object to the concept of NWS subchartering the ATEL Vessels, the subchartering could only be done "as long as it was fully disclosed, fully disgorged, and [with assurances] we would be getting the rates the vessel would be put out to service."[158]   Morais further explained that "it would be possible [for NWS] to subcharter provided that all the revenues would be disclosed and that . . . we would receive all the revenues.  So the fact that [NWS] could subcharter at rates at their discretion . . . wasn't problematic.  But the real issue is would they disclose it and would we be entitled to it?  Now if they subcharter without that, then that obviously would have been problematic for us."[159]

Despite defense counsel's attempt to mischaracterize Morais' comments to the portion of the proposed amendment dealing with subchartering, Morais clearly explained ATEL's position on this issue.  While Morais acknowledged that the concept of subchartering set forth in the proposed amendment may have been acceptable, his comments made it clear that any subchartering "has to be consistent with the terms of our charter, and, secondly, that we have to conduct due diligence."   Mr. Morais stressed that those were "two very, very important components" of what he said in his comments.[160]

Despite ATEL's rejection of the proposed amendment and Plaisance's objections to the entire scheme, NWS elected to proceed unilaterally with the Isenberg scheme. Lank, NWS' own counsel, instructed DeWitt that before the 10% markup scheme was implemented, ATEL must "have an understanding of how the marketing function actually worked at [SMM]" and that

---

[157] Rec. Doc. 589, Testimony of Morais, p. 159: 23-25 and p. 160:  1-11.
[158] Rec. Doc. 590, Testimony of Vasco, p. 18: 16-19.
[159] Rec. Doc. 590, Testimony of Vasco, p. 14:  16-25.
[160] Rec. Doc. 590, Testimony of Vasco, p. 20: 19-25.

ATEL "need[s] to understand [NWS] will subcharter out at a higher rate."[161]  Lank insisted that there need to be transparency in "setting up the arrangement" and that ATEL should be on notice[162].  The reason why Lank insisted on transparency was "to head off the kind of litigation you have now."[163]  Dewitt did not follow advice of his own counsel, and no one from SMM, NWS or Nabors inform ATEL at any time that SMM and NWS had implemented Isenberg's 10% skimming scheme.

## IX.    Defendants' Implementation Of The Isenberg 10% Skimming Scheme.

To effect the skimming scheme, NWS and SMM entered into a Master Time Charter Agreement ("MTCA") on January 19, 2005, which was drafted by Lank.[164]  The procedure followed was that NWS would enter into a time charter with an End User for the best rate that NWS could obtain in the existing market (the market rate).[165]  After the time charter with the End User was in place and the rate set, NWS would then deduct 10% from the End User rate and report this lower rate to SMM as the rate for which the vessel was being chartered.  SMM would then enter into a time charter agreement with NWS at a rate 10% less than what NWS was receiving from the End User.[166]

NWS would invoice the End User at the higher day rate reflecting the 10% markup.[167]  SMM would issue an invoice to NWS reflecting the lower day rate.[168]  NWS collected the revenue directly from the End User.[169]  NWS would, in furtherance of Isenberg's 10% skimming

---

[161]  Testimony of Lank, Rec. Doc. 591, p. 25: 25-26: 1-22; Ex. P-13.  Lank's comments to ATEL's objection to amendment.
[162]  Ex. P-13; Testimony of Lank, Rec. Doc. 591, p. 63-64; p. 69: 6-16.
[163]  Rec. Doc. 591, Testimony of Lank, p. 64: 8-19.
[164]  Ex. P-3, January 19, 2005 MTCA; Testimony of Lank, Rec. Doc. 591, p. 19.
[165]  Testimony of Ramirez, Rec. Doc. 591, p. 109: 4- p. 113
[166]  *Id.;* Testimony of DeWitt, Rec. Doc. 588, p. 166; Rec. Doc. 589, p. 122-123.
[167]  *Id.*
[168]  *Id.*
[169]  Ex. P-3, Testimony of Powell, Rec. Doc. 590, p. 154: 12-19; Testimony of Ramirez, Rec. Doc. 591, p. 107-110.

scheme, wire the lower amount to the SMM/ATEL lockbox account.[170]   The 10% that was skimmed from the higher charter hire rate paid by the End User was retained by NWS.   *NWS actively attempted to conceal Isenberg's 10% skimming scheme by expressly instructing its employees not to discuss the 10% markup with ATEL.*[171]

Once the scheme was put into motion, the only information Plaisance received was an on-charter form from NWS showing that a certain ATEL vessel was going on charter to a certain End User at a certain single rate.[172]   There was no indication that there was a 10% discrepancy. ATEL thought it was getting the market rate and 100% of what the End User was paying to charter the ATEL Vessels.   That's what Plaisance told him.[173]   ATEL never saw a copy of the charters with the End Users.[174]

ATEL paid all operating expenses promptly as soon as it received an invoice from SMM.[175]   However, ATEL would not typically receive charter payments from SMM until 90-120 days after the use of the vessels.[176]   The reason that SMM failed to pay ATEL timely is that NWS would not pay SMM the charter hire owed under the MTCA until NWS received payment from the End User[177].   Since SMM was undercapitalized, it could not pay ATEL until it received payment from NWS.   Conversely, because ATEL paid all costs up front and timely, they were having to pay out-of-pocket to cover operating expenses.[178]   ATEL was essentially capitalizing SMM's operation of its vessels.

---

[170] Ex. P-10, Rec. Doc. 590, Testimony of Auyeung, p. 118:8 – 121:15.
[171] Rec. Doc. 590, Testimony of Dennis Auyeung, p. 111:18-23.
[172] Rec. Doc. 587, Testimony of Plaisance, p. 139:1-3; 139:19-140:4.
[173] Rec. Doc. 587, Testimony of Monroe, p. 235; Rec. Doc. 588, p. 22; Rec. Doc. 587, Testimony of Plaisance, pp. 93, 113, 140.
[174] Rec. Doc. 587, Testimony of Monroe, p. 232.
[175] Rec. Doc. 587, Testimony of Monroe, p. 229:2-12.
[176] Rec. Doc. 587, Testimony of Monroe, p. 229:13-16.
[177] Rec. Doc. 591, Testimony Ramirez, p. 120:  15-18.
[178] Rec. Doc. 587, Testimony of Monroe, p. 229:17-23.

**X.     The Sale Of The Sea Mar Entities To Hornbeck which Uncovered Isenberg's 10% Skimming Scheme.**

NWS, SMM, and Nabors Finance sold all of their assets to Hornbeck on July 20, 2007.[179] This sale was necessitated by a change in U.S. laws declaring that U.S. flagged vessels could no longer be operated through a lease finance scheme like the one that NIL had in place.[180]  NIL was notified by the U.S. Coast Guard that NIL either had to sell the assets or reorganize the entities in a way that comported with the law.[181]

Plaisance went to work for Hornbeck for approximately four months following the sale and continued to manage the ATEL vessels.[182]  Powell also went to work for Hornbeck.[183] Because of the sale of assets and the reassignment of SMM employees to Hornbeck, ATEL permitted the assignment of SMM's management duties under the MBCA's to Hornbeck.[184]

After Hornbeck was assigned the ATEL accounts, ATEL immediately received a 10% increase in the charter rates it was receiving for the charter ATEL Vessels to the End Users.[185] Monroe discovered this increased charter hire when the first invoice received from Hornbeck had higher incentive fees than those previously being earned by SMM.[186]  When Monroe questioned Hornbeck regarding the increased incentive fees, Hornbeck sent the End User time charters that had been assigned from NWS to ATEL which showed that the charter rates that had been charged to the End Users by NWS was actually 10% higher than the rates being reported and

---

[179] Exhibit P-5; Rec. Doc. 587, Testimony of Plaisance, p. 56:14-18.
[180] Rec. Doc. 587, Testimony of Plaisance, p. 56:19-24.
[181] Rec. Doc. 588, Testimony of DeWitt, p. 77:15-78:17.
[182] Rec. Doc. 587, Testimony of Plaisance, p. 147:10-22.
[183] Rec. Doc. 588, Testimony of Monroe, p. 20:2-7.
[184] Rec. Doc. 588, Testimony of Monroe, p. 19:22-20:7
[185] Rec. Doc. 587, Testimony of Plaisance,  p. 143:18-144:2.
[186] Rec. Doc. 588, Testimony of Monroe, p. 20:15-23.

paid to ATEL.[187]  This was the first time that ATEL had knowledge that the charter hire being received from the End Users was not the same as that being reported to ATEL.[188]

Plaisance looked into this issue after he received a phone call from Monroe asking why ATEL had received a 10% raise across the board on all vessels.[189]  Plaisance suspected that the increase was related to NWS's markup of charter hire to the End Users.[190]  Plaisance discovered that the 10% markup created by the implementation of the Isenberg 10% skimming scheme was being retained in the Nabors Houston office and was never paid to either SMM or ATEL.[191]  Because this 10% markup was retained by a Nabors entity and not by SMM, Nabors received 100% of the markup as opposed to the 25% that it would have been entitled to through its partial ownership of Investco/SMM, providing the economic impetus for the skimming scheme.[192]  Despite repeated requests for more information, ATEL was stonewalled as neither Plaisance nor Nabors provided ATEL with information showing what truly had occurred over the course of their relationship therefore necessitating ATEL's suit.[193]

After the Nabors vessels were sold to Hornbeck and the MBCA's with ATEL were assigned, SMM and Investco ceased to operate. All of SMM and Investco's assets were sold to Hornbeck and the proceeds found their way to NIL.  *As such, any judgment solely against SMM may be hollow as ATEL may not be able to recover any amount of damages from SMM.*

---

[187] Rec. Doc. 588, Testimony of Monroe,  p. 21:2-23.

[188] Rec. Doc. 588, Testimony of Monroe,  p. 21:24-23:3.

[189] Rec. Doc. 587, Testimony of Plaisance,   p. 139:4-8.

[190] Rec. Doc. 587, Testimony of Plaisance,  p. 144:16-145:6.

[191] Rec. Doc. 587, Testimony of Plaisance,  p. 131:1-3; 131:13-19; 132:13-14; 133:1-21.

[192] Rec. Doc. 587, Testimony of Plaisance,  p. 134:20-135:6.

[193] Rec. Doc. 589, Testimony of Morais, pp. 165-166; Interestingly through a settlement between DeWitt and Nabors, DeWitt was forbidden to speak with ATEL or its lawyers, yet Dewitt met with Nabors' counsel to prepare for this trial testimony. Rec. Doc. 588, p. 94:19-95:8; Rec. Doc. 589, p. 175:13-14.

**LAW AND ARGUMENT.**

**I.      NIL, NWS  And SMM Operated As A Single Business Enterprise.**

The overwhelming evidence at trial demonstrated that despite the facade of separateness, SMM, NWS and NIL operated as a single business enterprise as concerns the ATEL Vessels.  As a result, a judgment in ATEL's favor against one of the defendants should serve as a judgment against all.

Since General Maritime Law is not a comprehensive system, state law may supplement it when it does not conflict with any established rule of General Maritime Law and where the application of state law does not violate the principle of national uniformity.[194]  Application of Louisiana's single business enterprise theory does not conflict with any established rule of law since the General Maritime Law has neither rejected nor adopted the single business enterprise theory.  In fact, Louisiana Federal Courts sitting in admiralty have recognized and applied the concept of single business enterprise when determining whether to pierce the veil of a corporation.[195]  Accordingly, the Court should apply the single business enterprise theory when determining whether any liability on the part of NIL, NWS, or SMM .

Alternatively, should the Court elect to apply the alter ego theory championed by Defendants, the elements are is nearly identical to Louisiana's single business enterprise theory.  In fact, ten of the twelve factors urged by Defendants are identical to those found within the eighteen single business enterprise factors listed below.[196]  The remaining two factors concern the integration, direction and supervision of the related companies and the organization, control, and conduct of the business of the related companies in such a manner that the related companies

---

[194] *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 216 (1917).
[195] *In re Athena Construction, L.L.C.,* 2008 WL 3186743 (W.D. La. 2008).
[196] *Andrew Martin Marine Corp. v. Stork-Werkspoor Diesel B.V.,* 480 F. Supp. 1270 (E.D. La. 1979).

should be considered one enterprise – considerations that are paramount to a single business enterprise analysis.[197]   Under either theory, the result is the same.

Generally, corporations are recognized as separate entities.[198]   "However, [under the single business enterprise theory] the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation."[199]  "Upon finding that a group of corporations constitute a "single business enterprise," the court may disregard the concept of corporate separateness to extend liability to each of the affiliated corporations *to prevent fraud or to achieve equity.*"[200]   "The extension of liability for a corporation's obligations beyond the confines of its own separate entity is appropriate in those cases where an essentially single business or economic enterprise is nevertheless conducted through several separate corporations."[201]  "When a group of corporations integrate their resources to achieve a common business purpose and do not operate as a separate entity, each affiliated corporation may be held liable for debts incurred in pursuit of its business purpose."[202]

It is clear in this case that NIL, NWS, Investco and SMM ("Sea Mar Entities") integrated their resources to achieve a common business purpose; namely, to operate and market vessels in an attempt to skirt or circumvent the U.S. Coast Guard/Jones Act foreign ownership restrictions. Prior to the 2002 inversion, the Sea Mar Entities were operated as a single subsidiary corporation within the Nabors corporate family.  Sea Mar Management, Inc. owned, operated and marketed

---

[197] *Id.*
[198] *Green v. Champion Ins. Co.,* 577 So.2d 249, 257 (La. App. 1 Cir. 1991).
[199] *Id.*
[200] *Id.* at 259 (emphasis added).
[201] *Id.*
[202] *Id.*

all Nabors vessels within a single business unit.[203]   After the inversion, Sea Mar Management,

Inc. could no longer operate the Nabors vessels in coastwise trade because it was now considered

a foreign company and was prohibited from doing so by U.S. law.[204]   To get around this legal

hurdle, Nabors divided Sea Mar Management, Inc. into SMM, Nabors Finance and Sea Mar

Division of Nabors Well Service.   Each of the Sea Mar Entities were tasked with providing

certain services for the Nabors vessels all of which were previously performed by Sea Mar

management, Inc..   Nabors Finance owned the vessels, NWS marketed the vessels, and SMM

operated the vessels.[205]   However, the overall function of the enterprise did not change.   The Sea

Mar Entities provided the same services that Sea Mar Management, Inc. provided to Nabors pre-

inversion.

 Whether an affiliated group of entities constitutes a "single business enterprise" ("SBE")

is a question of fact to be decided by the trial court.[206]   The following factors are considered

when determining whether a group of entities constitutes SBE:

> 1) corporations with identity or substantial identity of ownership,
> that is, ownership of sufficient stock to give actual working
> control;  2) common directors or officers; 3) unified administrative
> control of corporations whose business functions are similar or
> supplementary; 4) directors and officers of one corporation act
> independently in the interest of that corporation; 5) corporation
> financing another corporation; 6) inadequate capitalization ("thin
> incorporation"); 7) corporation causing the incorporation of
> another affiliated corporation; 8) corporation paying the salaries
> and other expenses or losses of another corporation; 9) receiving
> no business other than that given to it by its affiliated corporations;
> 10) corporation using the property of another corporation as its
> own; 11) noncompliance with corporate formalities; 12) common
> employees; 13) services rendered by the employees of one

---

[203] Rec. Doc. 587, Testimony of Plaisance, p. 45:7-11.

[204] Rec. Doc. 587, Testimony of Plaisance,  p. 45:7-11; Rec. Doc. 589, Testimony of Doerre, p. 16:5-22.

[205] Rec. Doc. 587, Testimony of Plaisance, p 47:5-7; Rec. Doc. 588, Testimony of DeWitt, p. 68:10-21, 109:14-21; Rec. Doc. 589, Testimony of Doerre, p. 16:1-12.

[206] *Oracle 1031 Exchange, LLC v.* Bourque, 2012 WL 385115 (La. App. 3 Cir. 2/8/12); *Green v. Champion Ins. Co.,* 577 So.2d 249, 257 (La. App. 1 Cir., 1991).

corporation on behalf of another corporation; 14) common offices; 15) centralized accounting; 16) undocumented transfers of funds between corporations; 17) unclear allocation of profits and losses between corporations; and 18) excessive fragmentation of a single enterprise into separate corporations.[207]

The above list is only illustrative, and no single factor is dispositive of the issue of whether a SBE exists.[208]  The evidence at trial overwhelmingly demonstrates that the Defendants were engaged in an SBE as concerns their dealings with ATEL.  "interpreted in accordance with said laws."[209]

## A.     Factor #1: Ownership of Stock Sufficient to Give Actual Working Control

NIL owned 25% of Sea Mar Investco, the parent and sole member of SMM, while the Jesselson interest owned 75% of Investco.[210]  NIL's general counsel testified that NIL had an indirect ownership interest.[211]  NIL owned, at least indirectly, 100% of NWS.[212]  Although NIL was only a minority owner of Investco (and therefore of SMM) on paper, in reality NIL, through NWS, controlled the business operations of SMM.

Although Jesselson was the President of SMM, Plaisance testified Jesselson "wasn't involved in day-to-day operations at all."[213]  As Powell testified, Jesselson "would normally agree with what the other members of the board decided" which was DeWitt and Plaisance.[214]  Jesselson was not involved in the day to day operations; he was a long-time family friend of Isenberg who was asked to just sit on the board.[215]  It is clear from the evidence presented at trial

---

[207] *Green v. Champion Ins. Co.*, 577 So.2d at 257-258.
[208] *Id.*
[209] Ex. P-1.
[210] Rec. Doc. 15, Statement of Corporate Disclosure by Sea Mar Management, LLC.
[211] Rec. Doc. 589, Testimony of Doerre, p. 68:10-20.
[212] Rec. Doc. 17, Statement of Corporate Disclosure by Nabors Well Services Co.
[213] Rec. Doc. 587, Testimony of Plaisance, p. 57:8-11.
[214] Rec. Doc. 590, Testimony of Powell, p. 142:1-19.
[215] *Id.*; Rec. Doc. 591, Testimony of Isenberg, p. 146:14-19.

that Jesselson was a "straw man" and that the real person running the operations of Investco/SMM was the CEO and president of both NIL and Nabors Industries, Inc,, Isenberg, acting through DeWitt.

DeWitt, an employee of NWS, gave SMM officers instructions regarding the management of SMM at the Investco/SMM board meetings.[216]   DeWitt instructed SMM on where the boats worked, when jobs were to start, and how to prepare for jobs.[217]   Further, NWS instructed SMM as to the rates that were to be charged to End Users.[218]   DeWitt was also heavily involved with the negotiation of the MBCA's between SMM and ATEL and the presentation of the proposed amendment to ATEL.[219]   Yet, in another example of DeWitt's inability to provide a forthright answer to questions asked at trial by ATEL's counsel, DeWitt inexplicably testified that he was not involved in the management of SMM or that he was unclear under which capacity he was working for.[220]   Although NWS was not a party to the MBCA's, these contracts were negotiated by DeWitt and Lank, a Nabors in-house attorney.[221]   DeWitt had daily conversations with Plaisance regarding the direction of the MBCA negotiations.[222]

De Witt reported to Isenberg and Isenberg's fingerprints are all over Defendants' dealings with ATEL as well. Doerre admitted that she had no personal knowledge of any communications made or actions taken by Isenberg with regard to the ATEL Vessels.[223]   As such, her testimony regarding the capacity Isenberg was acting in when he issued his directive to DeWitt should be

---

[216] Rec. Doc. 587, Testimony of Plaisance, p. 200:20-201:2.
[217] Rec. Doc. 587, Testimony of Plaisance, p. 57:23-58:6.
[218] Rec. Doc. 587, Testimony of Plaisance, p. 110:15-22.
[219] Rec. Doc. 588, Testimony of DeWitt, p. 120:5-19; 121:25-122:9, 123:19-24; See Exhibit P-6; Exhibit P-8, ; Exhibit P-10; Exhibit P-12; Exhibit P-14; Exhibit P-42.
[220] Rec. Doc. 588, Testimony of DeWitt, p. 85:4-21.
[221] Rec. Doc. 587, Testimony of Plaisance, p. 74:3-22; Rec. Doc. 588, Testimony of DeWitt, 121:25-122:9.
[222] Rec. Doc. 587, Testimony of Plaisance, p. 201:3-7.
[223] Rec. Doc. 589, Testimony of  Doerre, p. 64:16-65:3 and p. 71:7-19.

given little weight as it is purely theoretical and not based on any facts within her personal knowledge.

Even if Doerre's speculation were accepted, just because Isenberg may not have had the "authority" to act on behalf of NIL without board approval does not mean that he was not in fact acting on behalf of NIL as its CEO in its dealings with NWS and SMM and with respect to the MBCA's, including how much money NIL would ultimately receive from the ATEL contracts.

Isenberg was an employee of both NIL and NII and received compensation from both entities.[224]  He was aware that NIL was a Bermuda company and acknowledged that it was the ultimate parent company of the various Nabors entities.[225]  Isenberg testified that his job duties as chairman of NIL involved spending time with various business unit managers and senior staff.[226]  Part of this duty involved dealings with SMM business unit managers.[227]  Plaisance met with Isenberg numerous times in Houston regarding SMM budget issues and Isenberg even had direct involvement with the operations of some of SMM's vessels.[228]  DeWitt reported to Isenberg and informed him how NWS was performing.[229]  DeWitt and Isenberg had conversations quite often regarding the affairs of NWS, SMM, and Investco.[230]  During these discussions with DeWitt, Isenberg never told DeWitt the entity on whose behalf he was acting.[231]  Throughout Isenberg's testimony, he expressly states that his actions with the various business leaders was in his capacity as CEO of NIL.[232]  The facts clearly establish that Isenberg, in his

---

[224] Rec. Doc. 589, Testimony of Doerre, p. 51:11-52:6.
[225] Rec. Doc. 591, Testimony Isenberg, p. 127:4-9, 128:19-23, 133:20-25
[226] *Id.* at p. 127:13-17.
[227] *Id.* at p. 131:8-13.
[228] Rec. Doc. 587, Testimony Plaisance, p. 58:19-59:6.
[229] Rec. Doc. 591, Testimony of Isenberg, p. 135:7-17.
[230] Rec. Doc. 588, Testimony of DeWitt, p. 154:8-155:14.
[231] *Id.* at p. 153:11-21.
[232] Rec. Doc. 591, Testimony of  Isenberg, p. 127:13-17, 131:8-13, 135:7-17, 136:7-13

capacity as chairman and CEO of NIL, was heavily involved in many aspects of the business operations of NWS, SMM and Investco.

Although Doerre testified that U.S. law prevented Nabors from operating SMM (and thus causing non-U.S. flagged vessels to operate in U.S. coastwise trade) as self-serving justification for Isenberg not directing the actions of SMM while in his capacity as CEO of NIL, Doerre did not provide any facts that would support this supposition, other than her self-serving statement. The above facts, including the placement of DeWitt, President of Sea Mar Division of NWS, on the Investco board, the overall direction provided by Isenberg, CEO of NIL,, and the involvement of DeWitt in day-to-day functions such as contract negotiations and direction to SMM to amend the MBCA's, clearly establish that NIL, through its ownership of NWS, was in fact controlling the business decisions of SMM/Investco.[233]

## B.     Factor #2: Common Directors or Officers

The evidence showed that at all relevant times DeWitt served as both President of NWS and on the board of managers of Investco.[234]  Further, Plaisance understood that DeWitt was on the board of managers of SMM because of DeWitt's attendance at all SMM board meetings and DeWitt's direction of the company.[235]  This is compelling evidence in favor of finding a single business enterprise existed between NWS and SMM under this factor for two reasons.  First, it shows that DeWitt, the President of Sea Mar Division of NWS, was heavily involved in the business decisions of not only NWS as its President, but also Investco as board member and SMM since Investco exclusively managed SMM's business.[236]  Second, it shows a lack of corporate separateness between SMM and Investco.

---

[233] Rec. Doc. 589, Testimony of Doerre, p. 24:4-15.
[234]  Record Doc. 564, Uncontested Facts Nos. 31 and 32.
[235] Rec. Doc. 587, Testimony of Plaisance, p. 45:18-24.
[236] Exhibit P-24, at 4.01.

The dealings of Investco and SMM were so heavily integrated that Plaisance, a high ranking employee and officer of SMM, could not differentiate between the two boards of managers.[237]   Additionally, DeWitt testified that he did not characterize discussions regarding SMM and Investco separately, but considered them to concern "Sea Mar Management business in general." [238]   Further, Article 4.01 of SMM's operating agreement provided that Investco "has the exclusive right to manage SMM's business" thus further establishing the authority exerted on SMM by NWS. [239]   In addition, Investco received all of SMM's net profits. [240] This evidence clearly shows that the boards of Investco and SMM were essentially integrated and that the two entities were operated as one.  As such, DeWitt was effectively a member of the board of SMM for all practical purposes under this single business enterprise factor.

## C.   Factors #3 and 13: Unified Administrative Control of Similar or Supplementary Business Functions/Services Rendered by Employees of One Company to Another

The evidence clearly showed that NWS and SMM had supplementary business functions as they worked hand-in-hand in the vessel business.  In fact, NWS and SMM took great effort to appear as one entity to the marine industry.  SMM did not want to market vessels at the same time that NWS was marketing vessels because they "didn't want to compete amongst ourselves." [241]  According to Plaisance, this competition could lead to "confusion in the industry with our customers." [242]  NWS and SMM desired to have one person and one number for their customers to contact.[243]  NWS and SMM used the same SMM logo letterhead which logo was also painted

---

[237] Rec. Doc. 587, Testimony of Plaisance, p. 156:11-157:7.
[238] Rec. Doc. 588, Testimony of DeWitt, p. 155:6-14.
[239] Rec. Doc. 564, Uncontested Fact No. 28.
[240] Rec. Doc. 564, Uncontested Fact No. 27.
[241] Rec. Doc. 587, Testimony of Plaisance, p. 70:15-18.
[242] Rec. Doc. 587, Testimony of Plaisance, p. 70:19-20.
[243] Rec. Doc. 587, Testimony of Plaisance, p. 70:21-71:1.

on the hull of the ATEL Vessels.[244] Defendants' own expert, Mark Compeaux, testified that he considered all Sea Mar Entities as one and the same.[245]

The lines were so blurred between the Sea Mar Entities that their officers and employees frequently did not know which entity was taking certain actions. Plaisance testified that he never understood the corporate organization of the Sea Mar Entities. [246] Plaisance also believed that DeWitt was on the board of managers of SMM with him as DeWitt attended every SMM board meeting. [247] Plaisance also testified that although he assumed the board meetings he attended with DeWitt were SMM board meetings because Plaisance was invited and attended in his capacity as a board member of SMM, he was unsure if the board meetings that he attended were Investco or SMM board meetings. [248]

NWS also provided financial and accounting services for both SMM and Nabors Finance.[249] NWS received the financial reports of SMM and Nabors Finance every month and, with the assistance of Nabors Corporate Services, consolidated the financial reports of NWS, SMM, and Nabors Finance into one report. [250] SMM also submitted an operating budget to NWS which was used to calculate the per day management fee for the Nabors' vessels that was paid to SMM pursuant to the NWS/SMM time charters. [251] NWS was essentially acting as the back-office to SMM and determining SMM's profit margin while maximizing NWS' own profits.

---

[244] Exhibit P-6; Rec. Doc. 587, Testimony of Plaisance, p. 61:16-24, 126:9-10; 127:13-20.
[245] Rec. Doc. 590, Testimony of Plaisance, p.85:19-p.86:2.
[246] Rec. Doc. 587, Testimony of Plaisance, p. 155:8-11.
[247] Rec. Doc. 587, Testimony of Plaisance, p. 155:25-156:6.
[248] Rec. Doc. 587, Testimony of Plaisance, p. 156:11-157:7.
[249] Rec. Doc. 588, Testimony of DeWitt, p. 113:16-114:6.
[250] Rec. Doc. 588, Testimony of DeWitt, p. 113:16-114:6.
[251] Rec. Doc. 590, Testimony of Powell,  p. 146:9-18.

### D.      Factor #9: Receiving No Business Other than that of Affiliate Corporation

It is clear that the Sea Mar Entities did not receive any business other than that of its affiliates.  All vessels owned by Nabors Finance were only bareboat chartered to and operated by SMM. [252]  SMM operated and managed only Nabors Finance vessels until it entered into the MBCA's with ATEL. [253]  All Nabors Finance and ATEL vessels operated and managed by SMM were only time chartered to NWS. [254]  NWS was the only entity that provided marketing services for all of the vessels that it time chartered from SMM. [255]  NWS did not market any vessels other than those that were operated and managed by SMM.  It is clear that the relationship between the various Sea Mar Entities was entirely symbiotic.  They did no business outside of the Nabors family and were parts of an elaborate Nabors-concocted shell game to escape of avoid Jones Act and U.S. Coast Guard restrictions on foreign ownership .

### E.      Factor #18: Excessive Fragmentation

As described above, the Sea Mar Entities were fragmented following the inversion in order to allow Nabors to continue to operate its U.S. flagged vessels in coastwise trade despite the fact that they collectively were performing the same function that their single predecessor, Sea Mar Management, Inc., was performing pre-inversion.  However, the fragmentation does not stop here.  It continues all the way up the corporate ladder to the ultimate parent company, NIL. The corporate chart shows the spider web that NIL and its subsidiary and affiliated companies formed all over the world in an attempt to shield NIL from taxes. [256]

NIL was the ultimate parent company owning an interest in NWS and Investco. However, there are *nine* companies found in Nabors' organizational chart just in the direct line

---

[252] Rec. Doc. 588, Testimony of DeWitt, p. 88:18-89:19; Rec. Doc. 590, Testimony of Powell, p. 40:5-25.
[253] Rec. Doc. 590, Testimony of Powell, p. 151:3-8.
[254] Rec. Doc. 588, Testimony of DeWitt, p. 109:7-13.
[255] Rec. Doc. 591, Testimony of Lank, 38:4-24.
[256] Ex. D-1.

between NIL and NWS/Investco.  The direct ownership interest in NWS and Investco is held by Nabors Diamond Holdings. [257]  Nabors Diamond Holdings is a holding company with no employees and no responsibilities other than owning an interest in certain companies. [258]  Nabors Diamond Holdings, Inc. is in turn owned by Nabors Holding Co., which is exactly what its name implies, and again has no employees and only exists to hold interests in other Nabors entities. [259] Nabors Holding Co. is owned by Nabors Industries, Inc. [260]  Nabors Industries, Inc. has a grand total of two employees – one of whom is Isenberg, its Chairman and CEO.[261]  Between Nabors Industries, Inc. and NIL there are five more companies:  Nabors International Finance, Inc., Nabors Hungary Kft., Nabors Malta Holding Company, Ltd., Nabors Global Holdings, and Nabors Blue Shield. [262]  This unmistakably demonstrates excessive fragmentation throughout the Nabors entities from the ultimate parent company, NIL, all the way down through NIL's ultimate ownership interest in Investco/SMM.

**F.     Factor #7: Corporation Causing the Incorporation of Another Affiliated Corporation**

It is clear from the testimony that the incorporation of Investco, SMM, and Nabors Finance were caused by NIL to avoid U.S. tax consequences and allow the Nabors vessels to be operated in U.S. coastwise trade while still remaining under Nabors' control.  The Sea Mar Entities would not have been spun off of Sea Mar Management, Inc. if the Nabors corporate organization had not undertaken the "inversion" and reorganized offshore to avoid U.S. taxes.[263]

---

[257] Rec. Doc. 589, Testimony of Doerre, p. 19:4-7, 25:4-6.
[258] Rec. Doc. 589, Testimony of Doerre, p. 55:15-17.
[259] Rec. Doc. 589, Testimony of Doerre, p. 19:10-16.
[260] Rec. Doc. 589, Testimony of Doerre, p. 20:8-10.
[261] Rec. Doc. 589, Testimony of Doerre, p. 55:21-22.
[262] Rec. Doc. 589, Testimony of Doerre, p. 56:25-57:11.
[263] Rec. Doc. 589, Testimony of Doerre, p. 10:13-11:4.

### G. Other Factors Evidencing the Existence of a Single Business Enterprise between NIL, NWS, and SMM

#### 1. Factor #5 - Corporation financing another corporation

NWS solely financed the Sea Mar Entities.  All Sea Mar Entities other than NWS – SMM, Investco, and Nabors Finance – derived all income directly from the payments made to NWS by the End Users.  SMM received all funds for the operation of the Nabors vessels through its five year time charter with NWS. [264]  NWS was the only entity that time chartered vessels from SMM. [265]  All funds that SMM paid to Nabors Finance for the bareboat charter of the Nabors vessels, all operating expenses paid by SMM, and the management fee paid to SMM were derived from the time charter payments made by NWS to SMM. [266]  Investco's only source of income was derived from SMM's operations of the vessels, which was fully funded by time charter payments made to NWS by the End User and funneled down to SMM. [267]  Accordingly, it is clear that NWS funded the operations of all of the Sea Mar Entities and determined what profit each would earn.

#### 2. Factor #6 - Inadequate capitalization ("thin incorporation")

SMM was inadequately capitalized from the beginning.  Doerre testified that SMM was formed with very little capitalization and then was capitalized by Investco with "whatever capital was required to operate." [268]  However, Doerre has no personal knowledge regarding the amount of capitalization that was provided to SMM. [269]  The only evidence presented at trial shows that Investco only contributed $1,000.00 of initial capital in forming SMM. [270]  Additionally, Powell

---

[264] Rec. Doc. 588, Testimony of DeWitt, p. 103:9-25.
[265] Rec. Doc. 588, Testimony of DeWitt, p. 102:23-103:5.
[266] Rec. Doc. 588, Testimony of DeWitt, p. 105:16-106:17.
[267] Rec. Doc. 588, Testimony of DeWitt, p. 207:25-208:3.
[268] Rec. Doc. 589, Testimony of Doerre, p. 48:19-49:1.
[269] *Id.*
[270] Exhibit P-24.

testified that SMM had no working capital.[271]  NWS fronted the money necessary for SMM's operations to SMM each month.[272]  It is plainly evident from the testimony, (or lack thereof), that the operations of SMM/Investco and Nabors Finance were never properly capitalized and were only provided enough funds, on a short term basis, to continue operation.

      3.      <u>Factor #13 - Services rendered by the employees of one corporation on behalf of another corporation</u>

The evidence showed that NWS only rendered services on behalf of Investco/SMM. DeWitt and Lank negotiated the MBCA's and proposed amendments on behalf of Investco/SMM although their nominal employers had no privity of contract with ATEL.[273]  NWS also provided accounting and budget services to Investco/SMM and Nabors Finance.[274]

      4.      <u>Factor #14 - Common offices</u>

Although SMM's office was located in New Iberia, all of the offices of the remaining Nabors entities, including Investco which controlled the management of SMM, were located in the same office in Houston, Texas.[275]  NWS's office were located in Nabors' Houston office building,[276] as were the offices of Investco[277] and NIL's chairman and CEO, Isenberg.[278] Lank's office was also located in the same building.[279]

---

[271] Rec. Doc. 590, Testimony of Morais, p. 46:9-147:3.

[272] Rec. Doc. 587, Testimony of Plaisance, pp. 49:14-17; 51:13-16.

[273] Rec. Doc. 588, Testimony of DeWitt, p. 120:5-19; 121:25-122:9, 123:19-24;
        See Exhibit P-6; Exhibit P-8; Exhibit P-10; Exhibit P-12; Exhibit P-14; Exhibit P-42.

[274] Rec. Doc. 588, Testimony of DeWitt, p. 113:16-114:6; Rec. Doc. 590, Testimony of Powell,
        p. 146:9-18.

[275] Rec. Doc. 588, Testimony of DeWitt, p. 119:11-25.

[276] Rec. Doc. 588, Testimony of DeWitt, p. 119:23-25; Rec. Doc. 589, Testimony of Doerre, p. 53:5-8.

[277] Exhibit P-26; Rec. Doc. 589, Testimony of Doerre, p. 55:4-12.

[278] Rec. Doc. 588, Testimony of DeWitt,  p. 144:22-24; Rec. Doc. 589, Testimony of Doerre, p. 52:10-13.

[279] Rec. Doc. 588, Testimony of DeWitt p. 155:19-156:1.

Additionally, SMM's corporate operations were directed from Nabors' Houston offices. SMM often had board meetings at Nabors' Houston office.[280]  The offices of Investco and its one board member that resided in either Texas or Louisiana were also located in Nabors' Houston office.  Plaisance met with Isenberg four or five times a year in Houston.[281]  It is apparent that Nabors' Houston office was the nerve center for all of the operations of the Sea Mar entities.

### 5.  Factor #11 - Noncompliance with corporate formalities

Maintaining accurate corporate records is an essential factor in complying with corporate formalities.  Apparently, copies of the minutes of the SMM board meetings were stored in Nabors' Houston offices, however, those corporate minutes are now mysteriously "lost."[282]  The failure to maintain the corporate minutes of SMM is evidence of noncompliance with corporate formalities.

### 6.  Factor #16 - Undocumented transfers of funds between corporations

NWS and SMM also engaged in the undocumented transfer of funds when they engaged in Isenberg's 10% skimming scheme before entering into any contractual relationship.  The ATEL Vessels first began operating under the MBCA's in November 2004.[283]  SMM initially issued invoices to and collected payment from the End Users.[284]  However, NWS began issuing invoices to time charterers and collecting the payments owed.[285]  This was being done prior to the execution of the MTCA between SMM and NWS.[286]  NWS also began skimming 10% prior to the execution of the MTCA as the first skimmed charter began on January 2, 2005.[287]  The

---

[280] Rec. Doc. 590, Testimony of Powell, p. 144:23-145:5, 151:2-25.
[281] Rec. Doc. 587, Testimony of Plaisance, p. 58:19-25.
[282] Rec. Doc. 589, Testimony of Doerre, p. 18:19-19:3, 61:19-62:13.
[283] Exhibits P-19, P-20, P-21, P-22, Summary of transactions related to ATEL vessels.
[284] Rec. Doc. 587, Testimony of Plaisance, p. 110:8-12.
[285] Rec. Doc. 587, Testimony of Plaisance, p. 112:1-6.
[286] Exhibit P-19, Summary of transactions related to ATEL vessels.
[287] *Id.*

MTCA between NWS and SMM was not executed until January 19, 2005.[288]  This collection of payments and subsequent skimming by NWS was done with no documented contract in place between the parties.  The MTCA was entered into after the fact in order to provide some alleged justification for NWS' actions, thus clearly resulting in the undocumented transfer of funds.

## II.      SMM Breached The MBCA's.

To prevail on its breach of contract claim against SMM, ATEL must prove:  (1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of damages caused by that breach.[289]  "Courts must construe a charter according to the intent of the parties *as manifested by the whole instrument*..."[290]  Moreover, "*the charter must be construed to make sense and to reflect the intent of the contracting parties*."[291]

The parties stipulated and the evidence showed that ATEL and SMM entered into two Master Bareboat Charters ("MBCA") on July 7, 2004.[292]  The evidence conclusively established that SMM breached the terms of the MBCA's in multiple respects and that ATEL suffered significant damages as a result.

### A.      SMM Failed to Solicit, Bid, and Negotiate Time Charters.

Under Article 1 of the MBCA's, SMM was obligated to "manage, operate, maintain, oversee and supervise the time chartering, crewing, provisioning, maintenance, storage and repair of the [ATEL] vessels."[293]  Article 3(b) of the MBCA's further provided that "SMM shall be responsible for the solicitation, bidding and negotiation of time charters."[294]  Plaisance

---

[288] Exhibit P-3.
[289] *Exxon Corp. v. Cent. Gulf Lines, Inc.,* 500 U.S. 603, 605-06 (1991); *Krauss Bros. Lumber Co. v. Dimon S.S. Corp.,* 290 U.S. 117, 124 (1933).
[290] *See, e.g., Nitram, Inc. V. MV Cretan Life,* 599 F.2d 1359, 1368-69 (5th Cir. 1979)(emphasis added).
[291] *Wilson v. Job, Inc.,* 958 F.2d 653, 657 (5th Cir. 1992)(emphasis added).
[292] Exhibits P-1 and P-2, MBCA's dated July 7, 2004; Rec. Doc. 564, Uncontested Fact No. 1.
[293] *Id.*; Rec. Doc. 564, Uncontested Fact No. 1.
[294] *Id.*; Rec. Doc. 564, Uncontested Fact No. 5.

admitted that the MBCA's required SMM to oversee and supervise the time chartering of the ATEL Vessels.[295]  In addition, the management fee that SMM was receiving from ATEL was to compensate SMM for providing a number of services pertaining to the ATEL Vessels, including marketing.[296]

However, at the time the MBCA's were executed, SMM knew that it was not capable of marketing or obtaining time charters for the ATEL Vessels.[297]  Despite this knowledge, SMM did not at any time disclose to ATEL that SMM would not be marketing the ATEL Vessels to the End Users.[298]  Further, Plaisance readily admitted that SMM was never going to be overseeing and supervising the time charters for the ATEL Vessels as SMM always knew that NWS would be performing those services.[299]  It is undisputed that SMM did not at any time solicit, bid or negotiate time charters with the End Users of the ATEL Vessels in violation of the terms of the MBCA's.   This breached the MBCA's. Had SMM fulfilled its contractual obligations in this regard, no 10% markup would have been possible, and ATEL would have received all charter hire earned by the vessels as contemplated by the MBCA's.

Nabors' argument that SMM fulfilled its obligations under this provision by time chartering all ATEL Vessels to NWS is disingenuous at best.  Although Schedule II of the MBCA's lists NWS as a preapproved charterer, Plaisance testified that the entities listed in Schedule II were "approved ultimate customers, end-users".[300]  Further supporting Plaisance's testimony is the fact that all of the companies listed on Schedule II of the MBCA's were

---

[295] Rec. Doc. 587, Testimony of Plaisance, p. 66:17-18; 69:22-70-9; 86:-87:7.
[296] Exhibits P-1 and P-2, MBCAs dated July 7, 2004.
[297] Rec. Doc. 588, Testimony of DeWitt, p. 127:19-25, 182:16-23.
[298] Rec. Doc. 587, Testimony of Plaisance, p. 68:17-19; 69:7.
[299] Rec. Doc. 587, Testimony of Plaisance,  p. 84:17-89:1.
[300] Rec. Doc. 587, Testimony of Plaisance, p. 108:16-18.

companies that had MSA's with NWS.[301]  These were clearly the companies to whom SMM and ATEL intended to be the ultimate End Users of the Vessels.  In fact, the only reason that NWS was listed on Schedule II was that NWS was a potential charterer of the ATEL vessels for use in support of Nabors' drilling rigs, not as the sole time charterer.[302]

### B.  SMM Failed to Use Commercially Reasonable Efforts to Time Charter the ATEL Vessels – In Fact SMM Made No Effort.

Article 3(b) of the MBCA's provided that SMM was required to "use its commercially reasonable efforts to obtain time charters for the [ATEL] Vessels."  At trial, Plaisance admitted that SMM undertook **no** efforts to obtain time charters, much less commercially reasonable efforts.[303]  NWS obtained all time charters for the ATEL Vessels and negotiated and set all rates for these time charters.[304]  Because ATEL to no experience in the Gulf of Mexico vessel leasing market, it relied upon the expertise of Plaisance and SMM in determining whether rates were commercially reasonable.[305]  This obligation was clearly breached when SMM passed it on to NWS without the prior approval of ATEL and when SMM simply accepted the rate NWS told SMM would be paid.  There was **no** effort by SMM to get any market charter rate, much less a commercially reasonable rate.

Further highlighting SMM's breach of this provision, Dennis Auyeung, NWS' Vice President of Finance, testified that NWS would first obtain a time charter with the End User before a corresponding reduced-rate charter was ever presented to SMM.[306]  When NWS marketed the ATEL Vessels, NWS sought the best rates that the market would allow for

---

[301] Rec. Doc. 587, Testimony of Plaisance, p. 108:19-24.
[302] Rec. Doc. 587, Testimony of Plaisance, p. 109:14-23.
[303] Rec. Doc. 587, Testimony of Plaisance, p. 87:10-88:6.
[304] Rec. Doc. 587, Testimony of Plaisance,  p. 110:15-22, 111:10-21.
[305] Rec. Doc. 588, Testimony of Monroe, p. 45:2-12.
[306] Rec. Doc. 590, Testimony of Auyeung, p. 115:4-116:14.

NWS.[307]   According to DeWitt, these rates were **market rates** the End Users were paying.[308] After entering into a time charter with the End User, NWS would then execute an on-charter agreement with SMM for 10% less than the rate being obtained from the End User.[309]   The fact that SMM was consistently earning 10% less in charter hire than NWS was obtaining from End User's on time charters that were executed contemporaneously clearly proves that the efforts used by SMM in obtaining the time charters from NWS **were not commercially reasonable**. They were in fact consistently 10% less than commercially reasonable.

The Court should afford little weight to the expert testimony provided by Mark Compeaux as to market rates.  Compeaux is a vessel broker whose knowledge is limited to vessel brokerage.[310]   As DeWitt testified, NWS did not act as a broker under the arrangement between NWS and SMM, but acted as a time charterer.[311]   Further, Compeaux's opinion is based on the limited facts that were provided to him by Defendants.  Compeaux *only reviewed the charter rates obtained by NWS for the ATEL Vessels, not the rates at issue here, the rates NWS paid to SMM*, when he opined that the rates were commercially reasonable market rates.[312] Since Compeaux did not review any documents or information either detailing SMM's efforts in time chartering the ATEL Vessels or establishing the rates obtained by SMM, he had no basis to render an opinion on SMM's actions or whether the rates obtained by SMM were "commercially reasonable".

---

[307] Rec. Doc. 587, Testimony of Plaisance, p. 60:2-6.
[308] Rec. Doc. 588, Testimony of DeWitt, p. 101:8-11.
[309] Rec. Doc. 590, Testimony of Auyeung, p. 113:10-114:10; 115:4-116:14.
[310] Rec. Doc. 590, Testimony of Compeaux, p. 62:12-19.
[311] Rec. Doc. 588, Testimony of DeWitt, p. 130:14-20.
[312] Rec. Doc. 590, Testimony of Compeaux, p. 93:11-95:23.

C.   **SMM Failed To Account For And Report To ATEL All Income Earned By The ATEL Vessels.**

Under Article 3(i) of the MBCA's, SMM was required to "maintain books and records sufficient to completely and properly account for **all income** and expenses applicable to the [ATEL] Vessels including, without limitation, all the time charter hire, expenses, and Management Fees.[313]

Plaisance acknowledged that this provision required SMM to report **all** charter hire earned by the ATEL Vessels.[314] Plaisance testified that he initially thought SMM was reporting all charter hire, but that there were discrepancies when the vessels first went into service.[315] He later learned that SMM was not reporting all charter hire because the discrepancies he mentioned were, in fact, the differences in charter hire being retained by NWS and not being reported to SMM.[316]

The evidence clearly established that the ATEL Vessels earned an additional $3,019,206 in time charter hire that was neither reported to nor paid to ATEL.[317]

D.   **SMM Transferred Its Marketing Obligations To NWS In Violation Of The MBCA's.**

Under Article 6(a) of the MBCA's, SMM was to be paid a set Management Fee of $300/day per vessel for the services SMM was providing under the MBCA's, as well as an Incentive Fee of 5% over all "gross daily revenues for such Vessel in excess of $5000.00 per day per Vessel."[318] Under Article 6(b) of the MBCA's, SMM's Management Fee covered "Sea Mar's profit and compensation for the general and administrative expenses incurred by Sea Mar

---

[313] Ex. P-1 and P-2; MBCA's; Rec. Doc. 564, Uncontested Fact No. 8.
[314] Rec. Doc. 587, Testimony of Plaisance, p. 89:20-90:6.
[315] Rec. Doc. 587, Testimony of Plaisance,  p. 90:7-12.
[316] Rec. Doc. 587, Testimony of Plaisance,  p. 138:19-139:8; 144:16-145:6.
[317] Rec. Doc. 564, Uncontested Facts Nos. 53 and 54.
[318] Ex. P-1 and P-2; MBCA's; Rec. Doc. 564, Uncontested Fact No. 9.

in providing the services [under the MBCA] .. including without limitation: (i) **Sea Mar's commercially reasonable efforts to obtain time charters for the Vessels and to keep the Vessels under time charter throughout the term of [the MBCA's] and for the solicitation, bidding and negotiation of such time charters;** (ii) Sea Mar's maintenance of books and records sufficient to completely and properly account for all income and expenses applicable to the Vessels including, without limitation, all the time charter hire, expenses, and Management Fees; … (iv) … such reasonable and customary accounting, clerical, **marketing** and personnel services as are generally performed by Sea Mar and as are required to efficiently conduct the business affairs of the Vessels."[319]

These unambiguous provisions clearly provide that the Management Fee was to cover all marketing services for the vessels.  Instead, SMM effectively transferred its responsibility to market the ATEL Vessels to NWS in violation of the express terms of the MBCA's and at ATEL's expense.  In effect *ATEL ended up paying twice for the same marketing services.*

Defendants' argument that NWS provided a valuable marketing service for which it should have been compensated misses the mark.  ATEL paid SMM approximately $1.6 million over two and one-half years to provide marketing and other services for the ATEL Vessels.[320]  If SMM chose to assign/transfer its marketing obligations to NWS or any other entity, any compensation for marketing services should have come from the Management Fee ATEL was already paying to SMM as testified to by Vasco Morais, General Counsel for ATEL.[321]  It is inconceivable that ATEL should have to pay two entities for a service that was negotiated and included in the original MBCA's with SMM and was never modified.  Even more outrageous is Nabors' argument that the 10% of the charter hire skimmed by NWS, almost $3 million, and

---

[319] *Id.*; Rec. Doc. 564, Uncontested Fact No. 10.
[320] Ex. P-29.
[321] Rec. Doc. 590, Testimony of Morais, p. 42:11-43:14.

which equals nearly twice as much as ATEL agreed to pay SMM in Management Fees, was reasonable compensation for the "marketing services" rendered by NWS.

### E.      SMM Failed To Enter Into All Time Charters In The Name Of SMM.

Article 8(b) of the MBCA's required that "any and all time charters or other contractual relationships entered into with respect to the use of the Vessels shall be in the name of [SMM]."[322]   Plaisance admitted that SMM breached this obligation.[323]   Instead, NWS was entering into time charters with End Users in the name of NWS.[324]   This breach resulted in ATEL's being kept in the dark regarding the actual charter rates its vessels were earning and therefore prevented ATEL from learning of the scheme until it was too late and ATEL had incurred millions of dollars in damages.

### F.      SMM Failed to Issue Invoices to all Time Charterers of the ATEL Vessels

Article 7 of the MBCA provided that SMM "shall issue invoices to the time charterers of the [ATEL] vessels for time charter hire and other amounts payable for use of the Vessels."[325] Plaisance testified that the invoices referred to in this provision were the invoices issued to the End User by NWS.[326]   When the ATEL Vessels first came into service in November 2004, SMM was initially directly invoicing and receiving payment form the End Users as required under the MBCA's.[327]   However, when SMM allowed NWS to begin invoicing the End Users for the ATEL vessels, SMM facilitated NWS' implementation of the 10% skimming scheme.   Had SMM continued to invoice the End Users as required by the MBCA, no such scheme could have

---

[322] *Id.*; Rec. Doc. 564, Uncontested Fact No. 14.
[323] Rec. Doc. 587, Testimony of Plaisance,  p. 92:12-19; 206:21-207:3.
[324] Rec. Doc. 590, Testimony of Auyeung, p. 115:4-116:14.
[325] Ex. P-1 and P-2; MBCA's; Rec. Doc. 564, Uncontested Fact No. 10
[326] Rec. Doc. 587, Testimony of Plaisance, p. 93:11-14.
[327] Rec. Doc. 587, Testimony of Plaisance, p. 110:8-12.

been enacted since SMM, and presumably ATEL, would have known what the End Users were paying.

### G.      SMM Failed To Collect And Remit All Revenue Earned By The ATEL Vessels.

Article 8(a) of the MBCA's provided that "[SMM] will be responsible for and agrees to collect **all time charter hire and other revenue** earned from the operation of the [ATEL] Vessels".[328]  Article 8(d) of the MBCA's also provided that "all accounts receivable arising from the time chartering of the Vessels shall be remitted to [SMM], **irrespective of whether the invoice for time charter or related expenses is issued in the name of [SMM].**[329]

The plain language of these sections of the MBCA's required SMM to collect all accounts receivable arising from all time charters; even those not entered into by SMM.  SMM admittedly did not collect all revenue earned by the ATEL vessels as NWS retained 10% of all charter hire earned by the ATEL vessels.[330]  This additional 10% skimmed by NWS was never remitted to SMM and was never deposited into the joint lockbox account of SMM and ATEL.[331]

Plaisance testified that "all time charter hire and other revenue earned from the operation of the vessels" referred to in the MBCA referred to the payments received from the End User.[332]  Plaisance admitted that ATEL did not get all of the money it was owed under the MBCA's.[333]  Even if NWS' entering into the charters with the end users was somehow permitted under the MBCA's, SMM could not escape its obligation to collect all of the time charter hire even if the invoices were issued by NWS.

---

[328] Exhibits P-1 and P-2, MBCAs dated July 7, 2004; Rec. Doc. 564, Uncontested Fact No. 13.
[329] Exhibits P-1 and P-2, MBCAs dated July 7, 2004
[330] *Id.*; Rec. Doc. 564, Uncontested Fact No. 15.
[331] Rec. Doc. 564, Uncontested Fact No. 54.
[332] Rec. Doc. 587, Testimony of Plaisance,  p. 91:21-92:11.
[333] Rec. Doc. 587, Testimony of Monroe, p. 211:20-24; 212:7-8.

**H.      The MTCA between SMM and NWS, as well as the Subcharters between NWS and End Users Did Not Comply with the Terms of the MBCA's**

Article 3(b) of the MBCA's provides that "[a]ny time charter shall be in compliance with all terms and conditions of this Charter."[334]   Further, as a matter of law, all subcharters must be consistent with the terms of the original charter.[335]   Therefore, under both the plain language of the MBCA's and general maritime law, any charter entered into subsequent to the MBCA's must comply with the terms of the MBCA's.   The evidence at trial showed this did not occur.

NWS and NIL were clearly aware of the terms and conditions of the MBCA's.   DeWitt and Lank were involved in the drafting and negotiation of the MBCA's.[336]   Lank drafted the Master Time Charter Agreement ("MTCA") which was entered into by NWS and SMM.[337]   Although Lank recognized that the MTCA was required to be in compliance with the terms of the MBCA's, he did not compare the MBCA's to the MTCA when drafting it.[338]   Instead, Lank used a form master time charter agreement as a template in drafting the SMM/NWS MTCA.

It is clear that the MTCA did not comply with the terms of the MBCA's.[339]   The MTCA between NWS and SMM did not 1) require that Sea Mar be "responsible for and agree to collect all time charter hire and other revenue earned from the operation" of the ATEL vessels; 2) provide that "any and all time charters or other contractual relationships entered into with respect to the Vessels shall be in the name of Sea Mar"; and 3) provide that "all accounts receivable arising from the time chartering of the Vessels shall be remitted to Sea Mar, irrespective of

---

[334] Ex. P-1 and P-2.

[335] *The Ely*, 110 F. 563 (S.D. N.Y. 1901), affirmed 122 F. 447 (2d Cir. 1903), cert denied 189 U.S. 514 (1903).

[336] Exhibit P-9, Draft of MBCA with DeWitt handwritten note; Exhibit P-10, 11/30/04 email from DeWitt to Lank and outside counsel regarding MBCA; Exhibit P-15, Email string containing 5/26/04 email from Plaisance to DeWitt regarding MBCA's.

[337] Exhibit P-3, MTCA.

[338] Testimony of Lank, Rec. Doc. 591, p. 61:6 – 62:4, 80:10-22.

[339] Exhibits P-1 and P-2, MBCA's; Exhibit P-3, MTCA.

whether the invoice for the time charter hire or related expenses is issued in the name of Sea Mar."[340]

As NWS and SMM were intimately aware of the details of the MBCA's between ATEL and SMM, they had a duty to comply with the terms contained therein when entering into any subsequent time charters or subcharters.  Specifically, they had a duty to deposit all gross revenues earned by the ATEL vessels into the ATEL/Sea Mar joint lockbox as well as a duty to report all gross revenue.[341]  If the MTCA would have complied with the terms of the MBCA's, all revenues would have been deposited in the ATEL/Sea Mar joint lockbox and, as such, would have been disclosed to and received by ATEL.

I.     **SMM's Contractual Relationship With ATEL Was Not the Same As SMM's Contractual Relationship With The Nabors Vessels.**

Article 3(j) of the MBCA's provides as follows:

> Sea Mar shall provide general and administrative services in connection with the management and operation of the Vessels, and shall manage, oversee and supervise the operation of the Vessels, including, but not limited to overseeing the maintenance, repair, provisioning, inspection, dockage and cleaning of the Vessels; hiring, training and supervising the Crew and all other personnel necessary to operate, supervise and maintain the Vessels; commercially reasonable collection activities as are necessary and appropriate to collect the revenues from the time chartering of the Vessels; such reasonable and customary accounting, tax, clerical, marketing and personnel services as are generally performed by Sea Mar for other vessels owned or operated by Sea Mar. . .[342]

Defendants argue that this provision only requires SMM to market the vessels in the same manner as the other vessels managed and operated by SMM, i.e. only to NWS.  This argument falls flat for a number of reasons.  First, Defendants' strained interpretation of this provision does not comport with the intent of the provision.  This provision was inserted as protection for ATEL

---

[340] *Id.*

[341] *Id.*

[342] Exhibit P-1 and P-2 MBCA's dated July 7, 2004.

to ensure that SMM did not operate the Nabors vessels in a manner that was more favorable than that utilized in the operation of the ATEL Vessels.[343]  Defendants' interpretation of the contract would require the Court to find that the parties, after eight months of negotiations, agreed to terms that require them to assume facts that were not known by ATEL and are not memorialized in the MBCA's.  It is clear that this was not the intent of the parties.

Even if Defendants' proposed interpretation of the MBCA's is accepted, the facts do not support Defendants' conclusion that SMM did in fact market the ATEL Vessels in the same manner that SMM marketed the Nabors vessels as Plaisance testified that the arrangement with respect to the Nabors vessels was different than the arrangement regarding the ATEL Vessels.[344] Under the Nabors vessel arrangement, Nabors Finance received a fixed rate from SMM for the bareboat charter of the vessels and SMM received a fixed rate from NWS for the management of the vessels.[345]   Under the ATEL arrangement, ATEL was not guaranteed a flat rate for the charter of its vessels and, in fact, would receive no payment if the vessel was not working.[346]

Article 8(c) of the MBCA provides that "[SMM] has no liability whatsoever in the event any of the accounts receivable due from a time chartered vessel prove to be noncollectible."[347] As Plaisance testified, this provision required ATEL to bear the loss if an End User did not pay.[348]  However, under the arrangement for the Nabors vessels, Nabors Finance, the owner of the Nabors vessels, had absolutely no risk as to the non-payment by End Users.[349]  The market had absolutely no bearing on the rate received by Nabors Finance and, as such, there was no need for a requirement that SMM use commercially reasonable efforts in obtaining charters for

---

[343] Testimony of Morais, Rec. Doc. 589, p. 187: 6-15, Rec. Doc, 590, p.36.
[344] Rec. Doc. 587, Testimony of Plaisance, p. 201:8-12.
[345] Rec. Doc. 587, Testimony of Plaisance, p. 201:22-25; 202:7-15; 202:24-203:5.
[346] Rec. Doc. 587, Testimony of Plaisance, p. 203:15-20.
[347] Exhibits P-1 and P-2, MBCA's dated July 7, 2004.
[348] Rec. Doc. 587, p. 94:9-21.
[349] Testimony of Plaisance, Rec. Doc. 587, p. 52: 8-17; p. 203.

the Nabors vessels. On the other hand, the utilization and rate that ATEL received for the use of its vessels was driven solely by the market conditions at the time of the charter.

The fact that SMM time chartered both the Nabors and ATEL Vessels to NWS does not establish that the vessels were in fact marketed in the same manner. The Defendants have offered no evidence establishing that NWS charged and retained a consistent 10% markup for "marketing services" on all Nabors vessels for which it obtained time charters. The evidence actually establishes the opposite. NWS chartered the Nabors vessels at the best rate they could obtain in the market.[350] However, instead of keeping a 10% "fee," NWS kept whatever the difference was between the rates it received from the End User and the flat fee that was owed to Nabors Finance plus the operating expense and the $100 management fee paid to SMM.[351] NWS's fee was thus determined by the market and was calculated at the end of the time charter when all expenses were "trued-up." As such, NWS bore the risk of volatile market conditions.

On the other hand, the "fee" that was retained by NWS from the charter of the ATEL Vessels was a consistent 10% of the charter hire and was determined before the on-charter agreement was ever executed by NWS and SMM. Under the arrangement between NWS and SMM for the charter of the ATEL Vessels, NWS had no risk. The Nabors and ATEL Vessels were thus clearly not marketed in the same manner thereby resulting in SMM's breach of the MBCA's

> **J.    Marketing Is Not An "Other Service" Or, Alternatively, SMM Failed To Notify And Invoice ATEL For Any "Marketing Fee" Retained by NWS.**

Article 13 of the MBCA's provides as follows:

> It is understood and agreed by the parties hereto that **in addition to performing services for which Sea Mar will receive Management Fees**, Sea Mar, either directly or through its

---

[350] Testimony of DeWitt, Rec. Doc. 588, p. 91: 10-18.
[351] Testimony of DeWitt, Rec. Doc. 588, p. 97:9 – 98:7.

affiliated companies or designees, may perform **other services** (including without limitation maintenance and repair services), and may supply materials, equipment and supplies (including without limitation repair and replacement of parts, material, equipment and supplies) as are necessary for the operation of the vessels.  Sea Mar shall provide such services, material, equipment and supplies at commercially reasonable rates and industry-standard pricing and **shall provide ATEL documentation in support thereof**.  Such services, materials, equipment and supplies **shall be deemed ATEL expenses hereunder provided that** (1) such expenses shall be billed at Sea Mar's cost, but in any event, not greater than commercially reasonable rates and industry-standard pricing; and (2) **shall be disclosed by Sea Mar to ATEL on Schedule III hereof, in the written records, monthly reports, and invoices to ATEL** at the time of the reimbursement, as being amounts reimbursed directly to Sea Mar for materials or services provided by Sea Mar; and (3) shall be subject to all other requirements of Operating Costs under Article 3 hereof.[352]

Defendants argue that the "marketing services" provided by NWS are "other services" under the terms of Article 13 and was therefore permitted by the MBCA's.  However, this interpretation of Article 13 is incorrect and disingenuous.  First, marketing services are expressly listed in Article 6 as services that are to be provided by SMM in exchange for the Management Fee.[353]  As such, they do not qualify as "other services" under Article 13.  Morais was clear that the "other services" referenced therein did not include marketing of the vessels as marketing was one of the services that Sea Mar was contractually obligated to provide as part of its management fee.  " . . . I would not view marketing as being an expense as covered by this agreement.  This was intended to cover other services, and I think the parenthetical is illustrative of maintenance and repair services, things of that nature, that's what this provision was intended to cover.  Not the primary management of marketing and overall oversight.[354]  The clear and unambiguous intent of Article 13 is to provide a mechanism whereby SMM could bill ATEL for unforeseen

---

[352]Exhibits P-1 and P-2, MBCA's dated July 7, 2004; Rec. Doc. 564, Uncontested Fact No. 16.
[353] Exhibits P-1 and P-2.
[354] Testimony of Vasco Morais,  Rec. Doc. 590, p. 38, ll. 24-25; p. 39, ll. 1-5.

expenses that arose in connection with the operation of the ATEL Vessels and were not listed in the MBCA's and not for marketing services which were expressly provided for in the MBCA's as part of the duties covered by the Management Fee.

Second, Article 13 expressly requires the disclosure of all documentation in support of these "other services" to ATEL by SMM.  In fact, Article 13 provides that as a requirement for these "other services" to be deemed ATEL expenses, such expenses must be disclosed by SMM to ATEL through monthly reports or invoices.  It is undisputed that neither SMM nor NWS provided to ATEL at any time any invoices issued by NWS showing the 10% markup that it was charging as a "marketing fee."  Because these "other services" were never disclosed, they cannot now be deemed ATEL expenses under the MBCA's.

Finally, Defendants incredibly argue that Article 13 only applies to "other services" provided by SMM and not to those allegedly provided by NWS.  The plain language of the MBCA's dictates otherwise.  Article 13 expressly provides that the "other services" provision applies not only to those services rendered by SMM, but also to any "other services" rendered by any affiliate of SMM, including NWS.

**III.    NIL and NWS Intentionally Interfered With the Execution of the SMM-ATEL MBCA's Thereby Inducing SMM to Breach the MBCA's.**

In order to prevail on its claim for intentional interference with the MBCA's by NWS and NIL, ATEL must prove:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer;

(5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.[355]

As discussed in detail above, it is undisputed that valid contracts existed between ATEL and SMM.[356]   SMM clearly and admittedly breached numerous provisions of the MBCA's; specifically, those which required SMM 1) to use commercially reasonable efforts to obtain time charters for the ATEL vessels; 2) to solicit, bid, and negotiate time charters; 3) to maintain a monthly accounting of **all** income and expenses applicable to the ATEL vessels; 4) to issue invoices to time charterers and deposit payments in a lockbox account jointly accessible by SMM and ATEL; 5) to collect **all time charter and other revenue** earned by the ATEL vessels and distribute all such funds to a lockbox; 6) to deposit all such revenue in the lockbox within three days of receipt by SMM; and 7) to enter into all time charter agreements in the name of SMM.

It is further undisputed that DeWitt as well as Isenberg, looking out for Nabors' interests, were aware of the contracts in place between SMM and ATEL.  In fact, DeWitt was heavily involved in the negotiation of the MBCA's and the subsequent proposed amendment in his role as Nabors' designee on the Investco board.  Further, DeWitt's actions in connection with the MBCA's, the subsequent proposed amendment and the implementation of Isenberg's 10% skimming scheme were all directed by Isenberg.

It is also clear that DeWitt and Isenberg induced SMM to breach the MBCA's with ATEL.  At Isenberg's direction, DeWitt implemented the 10% skimming scheme in direct violation of the terms of the MBCA's.[357]   NWS concealed this information from SMM as

---

[355] *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.,* 949 F.2d 1384, 1387 n.3 (5th Cir. 1991).

[356] Rec. Doc. 564, Uncontested Fact No. 1.

[357] Ex. P-12; Testimony of DeWitt, Rec. Doc. 588, p. 143:23 – 146:6

evidenced by the blacked out on-charter forms received by Plaisance.[358]   Further, DeWitt, at the instruction of Isenberg and acting on behalf of NWS and NIL, attempted to have ATEL execute a proposed amendment that would have expressly allowed NWS to time charter the vessels at a higher rate even though there was no contract between NWS and ATEL.   Clearly, NWS and NIL believed that this amendment was necessary to implement Isenberg's 10% skimming scheme or they would not have required SMM to propose it.   When ATEL rejected the proposed amendment, NWS and NIL still went forward unilaterally with the implementation of Isenberg's 10% skimming scheme.   After the scheme was implemented, DeWitt instructed NWS employees that they were not to disclose the existence of the 10% markup to ATEL.[359]   The 10% markup retained by NWS and NIL directly resulted in SMM's inability to report and pay all revenue to ATEL thus breaching the MBCA's.

The higher charter rate earned by the ATEL vessels was carried out through an elaborate fraudulent billing scheme which was never disclosed to ATEL despite express instructions from Lank to DeWitt instructing him to disclose to ATEL the "marketing structure" used to obtain the higher rates and that NWS would be receiving more from the End User than was paid to ATEL.[360]   It was never contemplated during the negotiation and eventual execution of the MBCA's that NWS would charge a fee of 10% of the charter hires earned by the ATEL Vessels in exchange for its marketing services.[361]   In fact, when this scheme was proposed by DeWitt at a Sea Mar Investco/SMM board meeting, Plaisance objected to its implementation without first negotiating for this "fee" with ATEL.[362]   Plaisance firmly believed that the 10% skim was not

---

[358] Testimony of Plaisance, Rec. Doc. 587; p. 121: 14-25; p. 122: 7-8; p. 208: 9-16; p. 210: 1-10.
[359] Testimony of Dennis Auyeung, Rec. Doc. 590, p. 111:18-23.
[360] Testimony of Lank, Rec. Doc. 591: p. 24:18 – 26:22),   Ex. P-42, Email from Lank to DeWitt attaching Lank's comments to the proposed amendment; Rec. Doc. 564, Uncontested Fact No. 61, 62, and 86.
[361] Testimony of Plaisance, Rec. Doc. 587, p. 67: 16-21, p. 84: 17-85:24.
[362] Testimony of Plaisance, Rec. Doc. 587, p. 122:14 – 124:2.

permitted under the MBCA's.  Nevertheless, despite Defendants knowledge that this scheme was in violation of the MBCA's, Defendants still chose to carry out this scheme thereby depriving ATEL of more than $3 million in charter hires earned by the ATEL Vessels.  As established by the fact that a proposed amendment to the MBCA's was drafted by Nabors and presented to ATEL, NWS and NIL knew that they did not have the authority to enter into the "marketing arrangement" that was implemented in this case.  Despite this knowledge, they took the steps outlined herein to induce SMM to breach its contracts with ATEL.

ATEL Vessels earned an additional $3,019,206.00 in revenue ($2,873,508.00 after incentive fees are deducted) which was retained by NWS and NIL as a result of the subcharters entered into by NWS.  These profits would have been realized by ATEL had SMM deposited all revenue earned by the ATEL Vessels in the ATEL/Sea Mar lockbox as required under the MBCA's.

As established by the fact that a proposed amendment to the MBCA's was drafted by Nabors and presented to ATEL, NWS and NIL knew that they did not have the authority to enter into the "marketing arrangement" that was implemented in this case.  Despite this knowledge, they took the steps outlined herein to induce SMM to breach its contracts with ATEL.

As each of the elements of intentional interference with contract have been met, the Court should find in ATEL's favor on this cause of action.

## IV.   NIL, NWS, and SMM Committed/Conspired to Commit Fraud in Implementing and Executing Isenberg's 10% Skimming Scheme.

To prevail on its fraud claim, ATEL must prove that 1) the deceiving party made a material misrepresentation or non-disclosure; 2) the representation was false or the nondisclosure implied that the facts were different from what the deceived party understood them to be; 3) the deceiving party knew that the representation was false or that the nondisclosure implied the

existence of false facts; 4) the deceiving party intended the deceived party to rely on the misrepresentation or nondisclosure; and 5) the deceived party detrimentally relied upon the misrepresentation or nondisclosure. [363]  "A scheme may be fraudulent even though no affirmative representation of fact be made.  The deceitful concealment of material facts may also constitute actual fraud."[364] The evidence at trial established that SMM, NIL and NWS committed fraud through the following conduct which resulted in damages to ATEL in the amount of $3,019,206.00 ($2,873,508.00 after the 5% incentive fees are deducted) – the amount of revenue earned by the ATEL vessels and retained by Defendants which has not been paid to ATEL.

### A.    Fraud Committed By NIL.

It is not disputed that Isenberg called DeWitt and instructed DeWitt to implement the Isenberg 10% skimming scheme.[365]  Lank drafted a proposed amendment to the MBCA's which would have expressly allowed NWS to achieve the plan set as demanded by Isenberg.[366]  ATEL rejected this proposed amendment.[367]  After the proposed amendment was rejected by ATEL, NWS, at the direction of Isenberg as CEO of NIL and NIL, still went forward with the scheme. The actions of NIL were clearly designed to conceal from ATEL the true rates being received from the End Users for the charter of the ATEL vessels for the enrichment of NIL.

### B.    Fraud Committed By NWS.

The evidence of fraud against NWS is overwhelming.  NWS knew from the outset of negotiations that it would be marketing the ATEL Vessels and was therefore involved in the

---

[363] *Black Gold Marine, Inc. v. Jackson Marine Co., Inc.,* 759 F.2d 466, 470 (5th Cir. 1985).

[364] *Blachy v. United States,* 380 F.2d 665, 673-74 (5th Cir. 1967).

[365] Testimony of DeWitt, Rec. Doc. 588, p. 143: 25-1466.; Rec. Doc. 564, Uncontested Fact No. 77. Testimony of Monroe, Rec. Doc. 588, p. 19:20-21.

[366] Testimony of Lank, Rec. Doc. 591, p. 19: 10-25, pp. 39-40; Ex. P-8, 12/10/04 email from Lank to DeWitt attaching Proposed Amendment to MBCA's; Rec. Doc. 564, Uncontested Fact No. 80.

[367] Testimony of Plaisance Rec. Doc. 588, p. 19: 20-21; Rec. Doc. 564, Uncontested Fact No. 81.

negotiation of the MBCA's even though NWS was not a party to the agreement.[368] It is undisputed that DeWitt reviewed and commented on the MBCA's and knew the terms of the agreement.[369]

After the MBCA's were executed, Lank, on behalf of NWS and under the directive of Isenberg as CEO of NIL and NIL, drafted a proposed amendment to the MBCA's which would have expressly allowed NWS to subcharter the ATEL Vessels at rates set in its sole discretion.[370] Plaisance objected to this proposed amendment as the intent of the MBCA's did not contemplate a further markup by NWS as alleged compensation for its marketing services.[371]

NWS, through DeWitt, then implemented the Isenberg 10% skimming scheme despite ATEL's rejection of the amendment.  NWS did not at any time notify ATEL that it was charging higher charter rates for the ATEL vessels even after they were told to do so by Lank.[372]  Further, after the MTCA was executed and the Isenberg 10% skimming scheme was in place, DeWitt told Nabors employees not to reveal the existence of the scheme to ATEL.[373]  Even though Lank told DeWitt that NWS had to disclose to ATEL that NWS would be chartering ATEL's vessels at higher rates, DeWitt did not follow the advice of counsel, nor did any NWS, SMM, NIL or NIL employee or officer.  According to Defendants' own expert, it is industry practice that vessel owners are always informed that a vessel broker or marketing agent is marking up the rates on the chartered vessels in order to retain a fee for its services.[374]  This is a clear indication that

---

[368] Rec. Doc. 564, Uncontested Fact No. 39, 40, 41, and 42.

[369] Rec. Doc. 564, Uncontested Fact No. 41 and 42.

[370] Testimony of Lank, Rec. Doc. 591, p. 19: 10-25, pp. 39-40; Ex. P-8, 12/10/04 email from Lank to DeWitt attaching proposed amendment; Rec. Doc. 564, Uncontested Fact No. 80.

[371] Testimony of Plaisance, Rec. Doc. 587, p. 122:19 – 124:13;  Testimony of DeWitt, Rec. Doc. 588, p. 159:6; 161:22.

[372] Testimony of Lank, Rec. Doc. 591, p. 24:21 25:9.; Ex. P-42, 01/27/05 email from Lank to DeWitt attaching Lank's comments to proposed amendment.

[373] Testimony of Auyeung, Rec. Doc. 590, p. 111: 18-23, Rec. Doc. 564, Uncontested Fact No. 86.

[374] Testimony of Compeaux, Rec. doc. 590, p. 97: 8-3; p. 77: 24 – 78:5..

Defendants intended ATEL to rely on the fraudulent concealment of the Isenberg 10% skimming scheme.  ATEL did, in fact, rely on these nondisclosures to its detriment as evidenced by the more than $3 million earned by the ATEL vessels and retained by Defendants over the 2 ½ year period in which Defendants operated and marketed the ATEL Vessels.  Had ATEL been advised of the scheme it could have cancelled the MBCA's with its 30 day cancellation right.[375]  Nabors no doubt knew this and therefore did not reveal the scheme for fear of losing this profitable scheme.

### C.    Fraud Committed By SMM.

Throughout the negotiations of the MBCA's, SMM knew that it could not market the ATEL vessels.  It was understood all along by SMM and NWS that NWS was going to market the ATEL vessels. Despite this knowledge, SMM expressly represented to ATEL in the MBCA's that it would provide all marketing services for the ATEL vessels.[376]  The MBCA's expressly provided that the management fee paid to SMM included compensation for marketing services.  ATEL was never informed that SMM was being paid for services it could not and was not performing.[377]

Additionally, any charter entered into by SMM with NWS or third parties was required to comply with the provisions contained in the MBCA's.  Specifically, SMM had a duty to disclose all revenues received, including those received by NWS from third parties, pursuant to the clear and unequivocal terms of the MBCA's.[378]  Plaisance had actual knowledge of the higher rates being charged and retained by NWS when he received on-charter forms showing the higher rate being paid by the End Users.  He never told ATEL was NWS was doing.  Lank, Dennis

---

[375] Ex. P-1, p. 21, Article 10(b)(iv).
[376] Testimony of Plaisance, Rec. doc. 588, p. 69:22 – 70:3.
[377] Testimony of Plaisance, Rec. Doc. 587, p. 66:13 – 67:3.
[378] Ex. P-1 and P-2.

Auyeung, and DeWitt also testified that SMM was aware of the scheme.[379]   The 10% markup implemented by NWS was never reported to ATEL by SMM in furtherance of the fraudulent markup scheme and that the additional funds retained by NWS were never paid to ATEL.[380]

Finally, DeWitt testified that he had knowledge of the difference in charter hire rates being charged to the third party time charterers and those paid to SMM and ATEL under the MBCA's, and he was on the board of Investco, the owner of SMM.[381]   Clearly any knowledge of the higher charter rates by a member of Investco's board of managers is imputed to SMM as Investco controlled the business operations of SMM.[382]

## V.   NIL, NWS, and SMM Intentionally Misrepresented, Concealed, and/or Failed to Disclose Isenberg's Fraudulent 10% Skimming Scheme to ATEL.

In general, the elements of a claim for intentional misrepresentation are: (1) misrepresentation of a material fact, (2) with the intent to deceive, and (3) causing justifiable reliance with resultant injury.[383]

As set forth above, SMM intentionally misrepresented the fact that it could market the ATEL Vessels and did not disclose to ATEL that NWS was going to do the marketing.[384] Further, SMM, NWS and NIL intentionally concealed the fact that they were engaged in a fraudulent scheme whereby they skimmed 10% of all charter rates earned by the charter of ATEL Vessels.   The actions of SMM, NWS and NIL described above clearly demonstrate that SMM, NWS and NIL engaged in a persistent pattern of misrepresentation of material facts with the intent to deceive ATEL.

---

[379] Testimony of Lank, Rec. Doc. 591, p. 67:0 – 68:13.

[380] Rec. Doc. 564, Uncontested Fact Nos. 61 and 62.

[381] Rec. Doc. 564, Uncontested Fact No. 45.

[382] Rec. Doc. 564, Uncontested Fact No. 28.

[383] *Rashidi v. American President Lines, Ltd.,* 1994 WL 321031 (E.D. La. 1994) (citing La. C.C. arts. 1953, 2315).

[384] Testimony of Plaisance, Rec. Doc. 587, p. 66:13 – 67:3.

The manner in which the "marketing arrangement" was setup is further evidence of NIL and NWS's intent to conceal Isenberg's 10% skimming scheme from ATEL. This arrangement allowed NWS and NIL to retain 100% of the skimmed charter hire. Had SMM issued the invoices and reported the full rate to ATEL, NWS and NIL would have only been entitled to 25% of the management and incentive fee earned by SMM by way of their 25% ownership of Investco. This arrangement, like the reorganization of the Sea Mar Entities, was effected in order to allow the Nabors entities to earn as much money as possible.

ATEL justifiably relied upon these negligent material misrepresentations and/or nondisclosures in believing that it was receiving all revenue earned by its vessels. These misrepresentations and/or nondisclosures by SMM further allowed Isenberg's 10% skimming scheme to go undetected by ATEL until NWS was sold to Hornbeck Offshore, at which time Hornbeck began paying the full charter rate to ATEL previously being received by NWS. As a result of the fraudulent scheme, ATEL was deprived of revenue to which it was entitled under the terms of the MBCA's.

## VI.    SMM Was Negligent in Failing to Disclose Material Facts to ATEL.

In order to state a claim for negligent misrepresentation, a plaintiff must allege that: (1) the defendant, in the course of its profession, supplied false information to the plaintiff for a business transaction; (2) the defendant failed to exercise reasonable care in gathering the information; (3) the plaintiff relied on the information for the transaction that was intended by the defendant; and (4) the plaintiff suffered a resulting pecuniary loss.[385]

---

[385] *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.,* 137 F.3d 1455, 1471 (citing *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.,* 826 F.2d 424, 428-429 (5th Cir.1987), reh'g denied, citing *Grass v. Credito Mexicano, S.A.,* 797 F.2d 220 (5th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987) for the requirements to state a cause of action for negligent misrepresentation under Restatement (Second) of Torts § 552 (1977).

Throughout the negotiation of the MBCA's, SMM was aware that it did not have the capability to market the ATEL Vessels and that the ATEL Vessels were, in fact, going to be marketed by NWS.[386]  Despite this knowledge, SMM entered into a contract obligating itself to provide marketing services which it knew would be performed by NWS.[387]  SMM had a duty to disclose NWS's participation in the chartering of the ATEL Vessels at the time the contract was executed.  This information was not disclosed to ATEL at any point.[388]

SMM also had knowledge of the higher rates.  Plaisance knew of Isenberg's 10% skimming scheme when he received on-charter forms that showed a higher rate being charged to the End User than was being reported to ATEL.[389]  When Plaisance inquired into the reason for the higher rates, he began receiving on-charter forms in which the higher rate was blacked out.[390] He knew or should have known that the skimming was ongoing.  The fraudulent scheme was also discussed in an Investco/SMM board meeting.  As Plaisance testified, he objected to the scheme at this time on the grounds that this was  not the arrangement that had been negotiated with ATEL.[391]  After Plaisance objected, he was told by Van DeWitt that this is the way that the marketing was going to be carried out.  Plaisance never inquired further into the issue and the "marketing arrangement" was never disclosed the scheme to ATEL.

SMM, upon receiving information that higher rates were being charged and retained by NWS, had a duty to gather more information concerning this issue in order to ensure that this "marketing arrangement" was not being carried out in violation of the terms of the MBCA's. SMM had a duty to disclose to ATEL any knowledge of additional revenue being earned by the

---

[386] Testimony of Plaisance, Rec. Doc. 587, p. 66:13 – 67:3.
[387] Ex. P-1 and P-2.
[388] Rec. Doc. 564, Uncontested Fact No. 61 and 62.
[389] Testimony of Plaisance, Rec. Doc. 587, p. 138: 14-23; p. 208: 20-23.
[390] Testimony of Plaisance, Rec. Doc. 587, p. 121: 14-25, p. 122: 7-8; p. 208: 9-16, p. 201: 1-10.
[391] Testimony of Plaisance, Rec. Doc. 587, p. 19-25; Rec. Doc. 588, p. 159: 6-161:22.

ATEL Vessels and not being paid to ATEL.  This duty was clearly breached when it failed to exercise reasonable care in gathering readily available information regarding the fraudulent scheme being carried out by NWS and NIL.

As set forth above, ATEL justifiably relied upon SMM's misrepresentations which caused damages to ATEL.

## VII.   NWS and NIL Converted Funds That Were Rightfully Owed to ATEL.

"A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion."[392]   In order for ATEL to prevail on its claim of conversion, ATEL must prove that SMM, NWS and NIL, singly or working in concert as a single business enterprise, committed one of the following acts:

> 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel.[393]

Pursuant to the terms of the MBCA's, ATEL was entitled to all revenue earned by the chartering of the ATEL Vessels regardless of the identity of the party that entered into the time charters.[394]   This includes the $3,019,206 retained by NWS which was not paid to ATEL or accounted for as required by the MBCA's.[395]   Defendants possessed these funds in an unauthorized manner as they were acquired by Defendants through the implementation and execution of a Isenberg's fraudulent 10% skimming scheme.  Defendants asserted ownership over the funds when they were routinely swept into NIL's corporate accounts as established by

---

[392] *Quealy v. Paine, Webber, Jackson & Curtis, Inc.,* 475 So.2d 756, 760 (La. 1985).
[393] *Dual Drilling Co. v. Mills Equipment Investments, Inc.,* 98-0343 (La. 12/1/98), 721 So.2d 853, 857.
[394] Ex. P-1 and P-2; Rec. Doc. 564, Uncontested Fact No. 12 and 13.
[395] Rec. Doc. 564, Uncontested Fact No. 53 and 54.

the testimony of Doerre.[396]   Defendants further withheld possession of the funds from ATEL when they failed to disclose to ATEL the receipt of these funds and failed to deposit same in the ATEL/Sea Mar joint lockbox account.  Accordingly, ATEL is entitled to damages in the amount of $2,873,508.00 plus interest as a result of NIL and NWS's conversion of the 10% skimmed from all charter hire that was rightfully owed to ATEL under the terms of the MBCA's.

## VIII.   NIL and NWS Were Unjustly Enriched as a Result of Isenberg's 10% Skimming Scheme.

To prevail on its alternative claim for unjust enrichment, ATEL must establish that 1) there is an enrichment; 2) there is an impoverishment; 3) there is a connection between the enrichment and impoverishment; 4) there is an absence of justification or cause for the enrichment and impoverishment; and 5) there is no other remedy at law.[397]

As set for the above, Defendants implemented and executed a fraudulent scheme whereby NWS charged an additional 10% for all charter hire earned by the ATEL Vessels that was never reported or paid to ATEL as required under the MBCA's.  This 10% markup was retained by NWS and eventually swept into NIL's corporate accounts.  The NWS subcharters with End Users reflecting the increased charter hire were entered into before the time charters between SMM and ATEL reflecting the lower charter hires were executed.[398]  It is undisputed that these increased charter rates were never reported to ATEL.[399]  As a result of the fraudulent scheme, Defendants have been enriched by $3,019,206, and ATEL has been impoverished by the same amount.[400]  There is clearly a connection between the enrichment and impoverishment as

---

[396] Testimony of Doerre, Rec. Doc. 589, p. 50: 5-18.
[397] *Richards v. Wal-Mart Stores, Inc.,* 559 F.3d 341 (5th Cir. 2009).
[398] Testimony of Auyeung, Rec. Doc. 590, p. 115:4 – 116:14.
[399] Rec. Doc. 564, Uncontested Fact No. 43 and 44.
[400] Rec. Doc. 564, Uncontested Fact No. 53 and 54.

they both resulted from Isenberg's fraudulent 10% skimming scheme implemented and carried out by Defendants.

There is also clearly an absence of justification or cause as the higher charter rate earned by the ATEL Vessels was carried out through an elaborate fraudulent billing scheme which was never disclosed to ATEL despite express instructions from Nabors' in-house counsel instructing Defendants to disclose the "marketing structure" used to obtain the higher rates to ATEL.[401]   It was never contemplated that NWS would charge a blanket fee of 10% of the charter hires earned by the ATEL Vessels in exchange for its marketing services.[402]   In fact, Plaisance testified that when this scheme was proposed to certain SMM employees, they objected to its implementation without negotiating for this "fee" with ATEL.[403]   ATEL was never informed of the scheme, never approved of the scheme, and never executed the amendment that was proposed by NWS and SMM.   Nevertheless, Defendants proceeded to carry out this scheme thereby depriving ATEL of nearly $3 million in charter hire earned by the ATEL Vessels and rightfully owed to ATEL under the terms of the MBCA's.

## IX.   NIL, NWS, and SMM Are Solidarily and/or Jointly and Severally Liable for the Damages Due to ATEL.

"There is joint and several liability in tort suits under admiralty law. But admiralty law also adheres to principles of comparative fault."[404]   "Joint and several liability applies when there has been a judgment against multiple defendants. It can result in one defendant's paying more

---

[401] Testimony of Lank, Rec.  Doc. 591, p. 24:21 – 25:9; p. 25:13 – 16:22. ATEL Exhibit 42, Email from Lank to DeWitt attaching Lank's comments to the proposed amendment; Rec. Doc. 564, Uncontested Fact No. 61, 62, and 86.

[402] Testimony of Plaisance, Rec. Doc. 587, p. 84: 17-85:9..

[403] Testimony of Plaisance, Rec. Doc. 587, p. 122:19 – 124:13.

[404] *Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316, (3d Cir. 2003) (citing 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5-4 (3d ed. 2001) (explaining that both joint and several liability and comparative fault exist in admiralty tort actions and noting that comparative fault still applies in cases of strict product liability, "even though this requires a comparison of negligence and strict liability")).

than its apportioned share of liability when the plaintiff's recovery from other defendants is limited by factors beyond the plaintiff's control, such as a defendant's insolvency. When the limitations on the plaintiff's recovery arise from outside forces, joint and several liability makes the other defendants, rather than an innocent plaintiff, responsible for the shortfall."[405]

Should SMM, NWS and NIL be found at fault under any of ATEL's tort claims, all parties found to be at fault will be liable for the entire amount owed to ATEL. If either SMM, NIL, or NWS is insolvent, the remaining defendants shall be responsible for the insolvent party's apportioned share of liability.

## X.    DAMAGES

### A.    Contractual Damages

It is clear that SMM breached the MBCA's entered into with ATEL as a result of its aforementioned actions. ATEL suffered damages in the amount of $3,019,206.00 as SMM's breach of the MBCA's allowed NWS to implement its fraudulent scheme whereby it skimmed 10% of all day rates that were lawfully owed to ATEL under the terms of the MBCA. As NIL, NWS and SMM were engaged in a single business enterprise, the liability for this breach of contract is imputed to all parties engaged therein.[406]

The basic rule of contract remedies is that the plaintiff is to be put in the same position he would have occupied had the defendant performed his obligation.[407] Net profits or earnings which would have been made but for the breach are allowable where they are susceptible of accurate estimation and the evidence is conclusive.[408] Gains prevented, as well as losses sustained, may be recovered as damages for a breach of contract, where they can be rendered

---

[405] *McDermott, Inc. v. AmClyde,* 511 U.S. 202, 220-221, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994).

[406] *Green v. Champion Ins. Co.,* 577 So.2d at 259.

[407] *Morris v. Homco Int'l, Inc.,* 853 F.2d 337, 346 (5th Cir. 1988).

[408] *Polar Steamship Corporation v. Inland Overseas Steamship Corporation,* 136 F.2d 835, 840-841 (4th Cir. 1943).

reasonably certain by evidence, and have naturally resulted from the breach.[409]  The profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into.[410]

Defendants have stipulated that the ATEL Vessels earned additional revenue in the amount of $3,019,206.00 ($2,873,508.00 after the 5% incentive fees called for under the MBCA's for charter hire in excess of $5000.00 per day are deducted) as a result of the subcharters entered into by NWS.[411]  As explained above, these profits would have been realized by ATEL had SMM directly invoiced all End Users, provided marketing services, and deposited all revenue earned by the ATEL Vessels in the ATEL/Sea Mar lockbox as required under the MBCA's.  These amounts are conclusively established by internal accounting statements completed by NWS reflecting the amounts earned by NWS in excess of those actually paid to ATEL.[412]

### B.    Interest

#### 1.    Contractual Interest

ATEL is also entitled to recover contractual interest pursuant to the plain and unambiguous terms of the MBCA's.  Article 17 of the MBCA's provides that "[a]ny net Revenues or other amounts due by Sea Mar to ATEL; pursuant to the terms and provisions of

---

[409] *Id.* at 841.
[410] *Howard v. Stillwell & Bierce Mfg. Co.,* 139 U.S. 199, 205, 206, 11 S.Ct. 500, 503, 35 L.Ed. 147.
[411] Rec. Doc. 564, Uncontested Fact No. 53 and 54.
[412] ATEL Exhibit 16, Email from Ernesto Ramirez to Mario Villarreal attaching "ATEL Vessels Net Profit to Sea Mar Division of Nabors Well Services, Co."; Rec. Doc. 564, Uncontested Fact No. 53 and 54.

this Charter that are not paid to ATEL; within the time period specified in this Charter or, if a time period for payment thereof is not specified for herein within twenty (20) days of invoicing to the other party, shall bear interest at the prime, base, or reference rate of Bank of America, plus 2% until paid.  ATEL and Sea Mar each agree to pay such interest promptly at the end of each month as invoiced."[413]  As of July 31, 2012, the amount of interest owed is $1,507,917.20 if compound interest is allowed and $1,221,027.19 if simple interest is allowed.[414]

## 2.   Pre-Judgment Interest under the General Maritime Law

"In maritime cases the award of prejudgment interest is the rule, rather than the exception, and the trial court has discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable."[415] The date of injury, rather than the date of judicial demand, is the proper date from which prejudgment interest should run.[416] Awarding interest from the date that an injury occurred ensures that the injured party is fully compensated, which is the "essential rationale for awarding prejudgment interest."[417] When a party has free use of another's money during the time that it should have been paying for the daily charter hire, an award of interest from the date of injury is necessary for the aggrieved to be fully compensated.[418]

"Before it can calculate the award of pre-judgment interest the court must first answer three questions.  These are: (1) what rate of interest to use; (2) whether to calculate interest on a

---

[413] ExsP-1 and P-2, MBCA's; Rec. Doc. 564, Uncontested Fact No. 18.

[414] Ex. P-17, Contractual Interest Calculations; Ex. P-43, Bank of America Prime Rate

[415] *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.,* 71 F.3d 198, 204 (5th Cir. 1995).

[416] *See In re Signal Intern., LLC,* 579 F.3d 478, 500–01 (5th Cir.2009).

[417] *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995).

[418] *Sea Link Cargo Services Inc. v. Marine Centre Inc.,* 380 Fed. Appx. 460 (5th Cir. 2010) (awarding pre-judgment interest for breach of charter party agreement).

simple or compound basis; and (3) the date from which pre-judgment interest should run.[419] Admiralty courts have discretion in setting the rate of interest since it is awarded as compensation for the loss of use of funds.[420] Admiralty courts may be guided by state law in setting the interest rate.[421]

In the instant case, Defendants retained approximately 10% of all revenues earned by the ATEL Vessels for a period of 2 ½ years beginning in 2004/2005.  The revenue retained during this period is $3,019,206 ($2,873,508.00 after the 5% incentive fees called for under the MBCA's for charter hire in excess of $5000.00 per day are deducted).  None of the amount currently owed to ATEL has been paid by Defendants.  ATEL has been deprived of these funds for nearly eight years.  Should ATEL not be entitled to contractual interest pursuant to the MBCA's, pre-judgment interest must nonetheless be awarded by this Court to fully compensate ATEL for the fraudulently retained charter hire, at the Louisiana judicial interest rate.

### C.    Attorneys' Fees.

ATEL is also  entitled to attorneys' fees pursuant to the terms of the MBCA's.  Under the well-established American Rule used in the federal courts, "absent statute or enforceable contract, litigants pay their own attorney's fees."[422] However, courts may depart from the general rule that each party pays his own attorney's fees in "cases involving a common fund, situations where a party has willfully violated a court order, and cases of fraudulent, groundless, oppressive, or vexatious conduct."[423]

---

[419] *Todd Shipyards Corporation v. Turbine Services, Inc.* 592 F. Supp 380 (E.D. La. 1984).

[420] *Platoro Ltd. V. Unidentified Remains, etc.* 695 F. 2d 893 ( 5th Cir. 1983).

[421] *Id.* ;*Signal Oil and Gas v. Barge W-701*, 654 F.2d 1164 ( 5th Cir. 1980).

[422] *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975); accord *Holliday v. Todd Shipyards Corp.,* 654 F.2d 415, 419 (5th Cir.1981), overruled on other grounds, *Phillips v. Marine Concrete Structures, Inc.,* 895 F.2d 1033 (5th Cir.1990); *Director v. Robertson,* 625 F.2d 873, 876 (9th Cir.1980).

[423] *Holliday,* 654 F.2d at 419 n. 4.

There is no dispute that there is a valid and enforceable contract between ATEL and SMM. Article 19 of the MBCA's provides that "if either party hereto engages an attorney to enforce its rights against the other party and/or the Vessels under this Charter and/or institutes litigation to enforce such rights, the prevailing party shall be reimbursed by the other party for all attorneys' fees and expenses, court costs, expert fees, costs of Vessels arrest and seizure incurred thereby."[424] As such, ATEL is entitled to recover the full amount of its attorneys' fees incurred in connection with the litigation of this matter. The calculation of attorneys' fees has been bifurcated and to be determined at a later hearing.

Further, ATEL is entitled to recover attorneys' fees from NWS, NIL and SMM as a result of their fraudulent conduct. As explained in great detail above, Defendants engaged in an elaborate fraudulent scheme whereby NWS, pursuant to the directives of Isenberg, of NIL, charged an additional approximately 10% for the charter hire earned by the ATEL Vessels than what was actually paid to ATEL. This is clearly fraudulent conduct of the type contemplated in the exception to the American Rule, stating the general public interest policy, providing that attorneys' fees may be recovered with evidence of fraudulent conduct.

### D.    Punitive Damages

"Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct." *Atlantic Sounding Co., Inc. v. Townsend,* 557 U.S. 404, 409, 129 S.Ct. 2561, 174 L.Ed.2d 382 (2009). "The general rule that punitive damages [a]re available at common law extend[s] to claims arising under federal maritime law." *Id.* at 411. It is well established that punitive damages are available at common law for fraudulent conduct.[425]

---

[424] Exhibits P-1 and P-2, MBCA's; Rec. Doc. 564, Uncontested Fact No. 19.

[425] *See, e.g. James v. Frame,* 6 F.3d 307 (5th Cir. 1993); *Quest Medical, Inc. v. Apprill,* 998 F.2d 1014 (5th Cir. 1993).

"The prevailing rule in American courts also limits punitive damages to cases of . . . "enormity," where a defendant's conduct is "outrageous," owing to "gross negligence," "willful, wanton, and reckless indifference for the rights of others," or behavior even more deplorable." *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 493, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (internal citations omitted). "Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure." *Id.* at 494. Additionally, "heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect." *Id.*

While punitive damages are generally not available in breach of contract claims, they may be recovered when the conduct constituting the breach is also a tort for which punitive damages are recoverable. *Ryan Marine Services, Inc. v. Hudson Drydocks, Inc.,* 2012 A.M.C. 701, 708 (W.D. La. 2011). Although ATEL asserts a cause of action against SMM in this case, the conduct of SMM which caused the breach – concealing from ATEL that NWS, not SMM, would provide marketing services and concealing from ATEL the existence of Isenberg's 10% skimming scheme – clearly constitutes fraud for which punitive damages are recoverable. SMM failed to disclose to ATEL that it could not market the ATEL Vessels and that NWS would be marketing the ATEL Vessels in its stead despite possessing this information throughout the entire eight month MBCA negotiation process.[426] Further, SMM knew of the 10% markup being charged and retained by NWS as shown by the receipt of Plaisance of on-charter forms reflecting this higher rate.[427] Despite this knowledge of Isenberg's 10% skimming scheme, SMM failed to

---

[426] Testimony of Darrel Plaisance, Rec. Doc. 587, p. 160:23-161:12; Testimony of Tom Monroe, Rec. Doc. 587, 227:16-20; Testimony of Van DeWitt, Rec. Doc. 588, p. 127:19-25, 182:16-23.

[427] Testimony of Darrel Plaisance, Rec. Doc. 587, p. 116:12-18, 121:14-25, 122:7-8, 138:19-140:4, 208:9-16, and 210:1-5.

disclose this information to ATEL.[428]  This fraudulent conduct which directly caused SMM's breach of contract  clearly constitutes fraud for which punitive damages are recoverable.

However, even if the Court should find that SMM's actions only constitute a breach of contract and do not rise to the level of fraud, ATEL is still entitled to recover punitive damages against NIL and NWS as a result of their fraudulent conduct.  It is undisputed that there was no contract in place between ATEL and NIL or NWS.[429]  Accordingly, any fraudulent conduct by NIL or NWS cannot arise from ATEL's breach of contract claims.   Any exception to the availability of punitive damages arising from breach of contract claims do not apply to ATEL's claims against NIL and NWS.

Moreover, as shown above, it is clear that NIL and NWS committed fraud against ATEL in originating and implementing Isenberg's 10% skimming scheme.  The scheme originated with a phone call from Gene Isenberg, chairman and CEO of NIL, to Van DeWitt, President of NWS, wherein Isenberg ordered DeWitt to obtain an additional 10% on all charter hire of the ATEL Vessels.[430]  DeWitt, with the assistance of Jim Lank, a Nabors in-house attorney, then drafted and proposed an amendment to ATEL that would have allowed NWS to charter the ATEL Vessels at higher rates.[431]  ATEL rejected this amendment.[432]  Despite ATEL's rejection of the amendment, SMM and NWS entered into an MTCA whereby NWS was to market the ATEL Vessels.[433]  NWS then invoiced the End Users at rates 10% higher than those reported to ATEL.[434]  NWS never disclosed and in fact actively concealed the existence of this scheme from ATEL when DeWitt instructed NWS employees not to discuss the matter with ATEL and sent

---

[428] Rec. Doc. 564, Uncontested Fact No. 61.
[429] Rec. Doc. 564, Uncontested Fact No. 47, 68, and 69.
[430] Testimony of Van DeWitt, Rec. Doc. 588, p. 125:24-126:6; Exhibit P-15, p. 2, email from Lank to Ross.
[431] Testimony of Van DeWitt, Rec. Doc. 588, p. 158:2-6, 184:20-23.
[432] Testimony of Tom Monroe, Rec. Doc. 588, p. 19:20-21.
[433] Exhibit P-3, MTCA dated January 19, 2005.
[434] Exhibits P-19, P-20, P-21, and P-22, Summary of transaction related to the ATEL vessels.

on-charter forms to SMM in which the higher rates were blacked out.[435]  These intentional and deliberate actions on the part of NIL and NWS clearly establish a willful and wanton fraudulent scheme which allowed NIL and NWS to augment their profits received from the chartering of the ATEL Vessels.  Accordingly, ATEL is entitled to punitive damages as a result of the fraudulent conduct of NIL, NWS and SMM.

## CONCLUSION

Accordingly, this court should find in favor of ATEL and award it all damages to which ATEL is entitled including, but not limited to, the stipulated amount of $2,873,508.00 plus interest, costs, and attorneys' fees.[436]

Respectfully submitted by:

\_\_/s/Christopher S. Mann_____
GLENN G. GOODIER (#6130)
CHRISTOPHER S. MANN (#26397)
MATTHEW S. LEJEUNE (#32552)
Jones, Walker, Waechter, Poitevent,
   Carrère & Denègre L.L.P.
201 St. Charles Avenue, Floor 47
New Orleans, Louisiana 70170-5100
Telephone:     (504) 582-8332
Facsimile:     (504) 589-8332
E-mail:          ggoodier@joneswalker.com
E-mail:          cmann@joneswalker.com
E-mail:          mlejeune@joneswalker.com
Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2012 a copy of the foregoing Post-Trial Brief was filed electronically with the Clerk of Court using the CM/ECF System.  Notice of this filing will

---

[435] Rec. Doc. 564, Uncontested Fact No. 62; Testimony of Darrel Plaisance, Rec. Doc. 587, p. 121:14-25; 122:7-8; 208:9-16; Testimony of Dennis Auyeung, Rec. Doc. 590, p. 111:18-23.

[436] The parties agreed that the amount of attorneys' fees would be determined at a separate hearing.  Rec. Doc. 564, pp. 69-70

be sent to all counsel of record registered to receive electronic service by operation in the Court's electronic filing system. I also certify that I have mailed this filing by United States Postal Service to all counsel of record who are not registered to receive electronic service by operation in the Court's electronic filing system.

                                                ___/s/Christopher S. Mann_____